[Cite as *State v. Moore*, 2019-Ohio-1671.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2018-CA-14 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-410 |
| | : | |
| ANTHONY R. MOORE | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 3rd day of May, 2019.

. . . . . . . . . . .

NATHANIEL R. LUKEN, Atty. Reg. No. 0087864, Greene County Prosecutor's Office, Appellate Division, 55 Greene Street, 1st Floor, Xenia, OH 45385
     Attorney for Plaintiff-Appellee

DAVID R. MILES, Atty. Reg. No. 0013841, 125 W. Main Street, Suite 201, Fairborn, Ohio 45324
     Attorney for Defendant-Appellant

. . . . . . . . . . . . .

HALL, J.

{¶ 1} Anthony R. Moore appeals from his conviction and sentence on five counts of gross sexual imposition involving a child under age 13, five counts of rape of a child under age 13, and three counts of rape by force.

{¶ 2} Moore advances eleven assignments of error. The first four involve the trial court's admitting into evidence statements made by the minor victim, A.D., to various people. Moore contends the child's statements were inadmissible hearsay. The fifth assignment of error challenges the trial court's decision to allow leading questioning of A.D. about anal intercourse allegations. The sixth assignment of error alleges cumulative error based on the foregoing evidentiary issues. The seventh and eighth assignments of error challenge the legal sufficiency and manifest weight of the evidence to sustain Moore's convictions. The ninth assignment of error alleges that the record does not support the trial court's imposition of consecutive sentences. The tenth assignment of error challenges the trial court's imposition of statutory maximum sentences for gross sexual imposition and rape. Finally, the eleventh assignment of error alleges cruel and unusual punishment based on the maximum sentences imposed.

{¶ 3} At trial, A.D. testified that Moore had been her mother's boyfriend and that he had moved into her mother's house when A.D. was 10 years old. (Tr. at 44.) From age 10 to 12, she lived with Moore, her mother, and her brother in a house on Lowell Road in Greene County. They then moved to a house on Atkinson Drive in Greene County, where they resided until Moore's arrest in the summer of 2017. (*Id.* at 36-37.) A.D. considered Moore to be her stepfather. (*Id.* at 44.)

{¶ 4} On June 15, 2017, 13-year-old A.D. spent the day at King's Island amusement park. Upon returning to the house on Atkinson, she took a shower, got

dressed, and fell asleep in her mother's bed while watching Netflix. (*Id.* at 46, 48.) At that time, A.D.'s mother and Moore were sleeping on a couch in the living room where there was air conditioning. (*Id.* at 47-48.) A.D. testified that Moore came into the bedroom three times that night and touched her "butt" with his hand underneath her clothes. (*Id.* at 49.) After the third time, he pulled down her pants, got on top of her, and put his penis in her vagina. (*Id.* at 50-51.) A.D. testified that she did not want to have sex with Moore and that her vagina hurt. (*Id.* at 51-52.) After Moore ejaculated and left the room, A.D. pulled up her pants and tried to go back to sleep. (*Id.* at 53.)

{¶ 5} The following morning, A.D.'s father picked her up to go out for breakfast. (*Id.* at 53.) A.D. then went swimming at her uncle's house before going to a church social activity. (*Id.* at 54-55.) She ended the day at her father's girlfriend's house, where she spent the night. (*Id.* at 56.) While there, A.D. told her father's girlfriend what Moore had done the previous night. (*Id.* at 61.) A.D.'s father also was present, and his girlfriend told him what had happened. (*Id.* at 62.) Shortly thereafter, A.D.'s mother called A.D. and asked whether "it was true." (*Id.* at 64.) A.D. responded affirmatively. (*Id.*) She then returned to the Atkinson house and told a police officer what Moore had done the previous night. (*Id.*) A.D. also went to the hospital to be examined by a nurse. (*Id.* at 65.) As part of the examination, the nurse collected her underwear, which was the same pair she had been wearing the night before. (*Id.* at 66.) On two subsequent occasions, A.D. told a doctor at Dayton Children's Hospital and a representative of Michael's House, a child-advocacy center, what Moore had done to her. (*Id.* at 67.)

{¶ 6} A.D. testified at trial that the incident on June 15, 2017 was not the only time Moore had abused her. She stated that the abuse began when she was 11 years old and

living on Lowell Road. (*Id.* at 67-68.) According to A.D., it happened "[a]lmost every day" at the house on Lowell. (*Id.* at 68.) A.D. estimated that after she moved to Atkinson Drive the abuse occurred "[e]very couple nights." (*Id.*) With regard to what occurred at the Lowell residence, A.D. testified that she was under the age of 13 the entire time and that the abuse occurred in different places in the house. (*Id.* at 68-69.) As for specific incidents, A.D. testified that on one occasion Moore placed his erect penis in her mouth two times while she was on a living room couch. During that incident, he also placed his hand underneath her clothes and touched the outside of her vagina. (*Id.* at 69-75.) A.D. recalled another time when she was sleeping in her mother's bed with her mother and Moore. On that occasion, Moore reached underneath her clothes and rubbed the outside of her vagina with his hand. (*Id.* at 78-79.) On yet another occasion, A.D. and Moore were on her mother's bed while her mother was in the shower. According to A.D., Moore pulled down her pants, placed his erect penis in her vagina, and ejaculated. (*Id.* at 80-83.) A.D. then testified about a time at the Atkinson house prior to her 13th birthday when she was sleeping on a couch. A.D. recalled that Moore touched her "butt" underneath her clothes and also put his penis in her vagina. (*Id.* at 87-90.) A.D. testified that on multiple occasions Moore put his erect penis in her "butt" and that it hurt. (*Id.* at 97-100.) A.D. also recalled an incident at the Atkinson house before she was 13 when Moore inserted his penis in her vagina and then pulled it out and held it so he would not ejaculate inside of her. (*Id.* at 103-104.)

{¶ 7} The next witness at trial was L.M., who was A.D.'s father's girlfriend at the time of A.D.'s disclosure of sexual abuse. L.M. testified that A.D. and another girl came to her house on June 16, 2017 to spend the night. (Tr. at 219.) While there, A.D. started

braiding L.M.'s hair. As she did so, A.D. mentioned that she did not want to stay with Moore at her mother's house anymore. (*Id.* at 222.) A.D.'s father then asked, "[T]hat boy hasn't touched you, has he?" A.D. did not directly answer but repeated that she "never wanted to be there anymore." (*Id.* at 230.) A.D. then went into the kitchen and asked L.M. to come in to talk. A.D. proceeded to disclose that when she woke up the previous night her pants were down. (*Id.* at 237.) A.D. indicated that her vagina felt "different" and she identified Moore as having been involved. (*Id.* at 238.) L.M. and A.D. then got in a car and headed toward the child's mother's house. Before they arrived, A.D. admitted that she and Moore had engaged in sexual intercourse, that it was not the first time, and that it first happened when she was 10 years old. (*Id.* at 256.)

{¶ 8} The next witnesses were forensic scientists Sara DeVine and Katharine Dailey from the DNA section of the Ohio Bureau of Criminal Investigations. DeVine testified about bodily fluid on a pair of underwear collected from A.D. during a sexual-assault examination at the hospital. (*Id.* at 282.) She confirmed the presence of semen in the crotch of the underwear. (*Id.* at 312.) Dailey then performed DNA testing on the semen and found a mixture of DNA profiles. A.D. was identified as one of the contributors. (*Id.* at 338.) After obtaining and testing a DNA sample from Moore, Dailey identified him as the other contributor. (*Id.* at 346.) She opined that the chance of the DNA sample being consistent with that of another person was less than one in one trillion. (*Id.* at 347.)

{¶ 9} The next person to testify was A.D.'s mother, M.D. She testified that she was in a relationship with Moore in June 2017. (*Id.* at 357.) She had lived with him in a house on Lowell Road from June 2014 until September 2016. (*Id.* at 360.) They had lived on Atkinson Drive from September 2016 until June 2017. (*Id.*) M.D. testified that A.D. was

younger than 13 years old the entire time they lived on Lowell Road. (*Id.* at 361.) A.D. turned 13 years old in October 2016 shortly after they moved to Atkinson Drive. (*Id.* at 361-362.) M.D. testified that she was a sound sleeper who sometimes took sleeping medication. She also testified that A.D. sometimes slept in the same bed with her and Moore when they lived on Lowell Road and on Atkinson Drive. M.D. sometimes slept with Moore on a living-room couch and allowed A.D. to sleep alone in their bedroom. (*Id.* at 362-365.)

{¶ 10} The night before A.D.'s disclosure, M.D. and Moore had slept on the couch and A.D. had slept in their bed. M.D. recalled Moore "getting up and getting down" during the night before finally staying asleep. (*Id.* at 368.) M.D. arose in the morning and went to work. Later that day after work, L.M. took A.D. to stay at L.M.'s house with the child's father. (*Id.* at 373.) Later still, A.D.'s father came to M.D.'s house. He was angry and was looking for Moore. (*Id.* at 383.) In response, M.D. called A.D. on the telephone and asked whether Moore had tried to touch her. A.D. started crying and responded affirmatively. (*Id.* at 384-386.) Moore was home with M.D. at the time, and he "took off out the back door." (*Id.* at 387.) A.D. then returned to M.D.'s house within minutes, and M.D. called the police. (*Id.*) A.D. disclosed to the police that Moore had put his penis in her vagina. (*Id.* at 388.) M.D. then took A.D. to the hospital for an examination by a sexual-assault nurse. She later took A.D. to Michael's House, a child-advocacy center, to be interviewed and to a clinic for another examination. (*Id.* at 390.)

{¶ 11} The next witness at trial was A.D.'s cousin, A.M. She testified about one occasion in the summer of 2017 when she was at M.D.'s house watching movies and she saw Moore appear to be touching A.D.'s "butt." (*Id.* at 408-410.) She could not actually

see his hand, however, because it was under the covers. (*Id.* at 411.)

{¶ 12} Xenia police officer David Wilson testified about arriving at the Atkinson residence following A.D.'s disclosure. He met police officer Rebecca Lilje there and proceeded to collect evidence and photograph the scene. (*Id.* at 424-450.) For her part, Lilje testified about interviewing A.D. at the Atkinson residence. She recalled that A.D's eyes were red, and it appeared as if the child had been crying. A.D. also seemed nervous. (*Id.* at 544.) A.D. told the officer that she had returned home from King's Island and had showered before falling asleep in her mother's bed. She awoke to find her pants pulled down with Moore in the bed trying to have sex with her. (*Id.* at 553.) A.D. tried to pull away, but Moore succeeded in placing his penis inside her vagina. (*Id.*) A.D. told Lilje that she still was wearing the same underwear she had on when the incident occurred. (*Id.* at 554.)

{¶ 13} Dr. Kelly Liker also testified as a prosecution witness at trial. She was the medical director of child advocacy at Dayton Children's Hospital. (*Id.* at 453.) A.D. was referred to Liker by Michael's House. Liker examined A.D. on July 24, 2017. (*Id.* at 463.) Prior to the examination, Liker reviewed a summary from Michael's House identifying the types of sexual contact that A.D. claimed had occurred. (*Id.* at 467.) A.D. proceeded to tell Liker that Moore had forced her to engage in sexual intercourse with him. (*Id.* at 468.) She added that Moore's "private part also made contact with her butt and with her mouth[.]" (*Id.*) Liker's physical examination of the child was "normal." (*Id.* at 473.) Such a finding neither supports nor rebuts a claim of sexual abuse. (*Id.* at 474, 485.)

{¶ 14} The next witness was Kelly Azzam, a pediatric sexual assault nurse examiner at Dayton Children's Hospital. (*Id.* at 492.) She testified about examining A.D.

on June 17, 2017, shortly after A.D. made her disclosures of sexual abuse. Azzam took A.D.'s underwear, collected various swabs, and obtained information from the child about the most recent incident. (*Id.* at 503-523.) A.D. reported that Moore was touching her "butt," that she awoke with her pants down, and that she thought he put his "private" in her "private." (*Id.* at 514.) On a spreadsheet, Azzam check-marked "unsure" as A.D.'s response when asked about specific forms of sexual contact and conduct with Moore. (*Id.* at 510.) Azzam check-marked "no" for oral contact involving A.D.'s mouth and Moore's genitals. (*Id.*) Azzam's spreadsheet reflected that A.D.'s emotional status during the examination was "calm." (*Id.* at 514.) She testified that it was "very common" for children not to come forward with all of the details when reporting sexual abuse. (*Id.* at 534.)

{¶ 15} The State also called detective Jeff Moore as a prosecution witness. He was the lead detective investigating A.D.'s sexual-abuse allegations. (*Id.* at 565.) The first thing he did was set up an interview for A.D. at Michael's House, where he knew there would be someone specially trained in interviewing child sexual-abuse victims. (*Id.* at 568-569.) Detective Moore was present when the initial Michael's House interview occurred on June 20, 2017. He observed it from another room on a television. (*Id.* at 570.) Moore testified that a second interview occurred at Michael's House on July 18, 2017. He observed that interview from another room the same way. (*Id.* at 573.) He did not personally ask A.D. any questions during either interview. (*Id.*) Detective Moore explained that he did not ask for various items taken from M.D.'s home to be tested by the crime lab—particularly sheets, pillow cases, and a blanket—because they came from Moore's bedroom and for that reason would have his DNA on them and, therefore, would not assist in the investigation. (*Id.* at 585-586.) He explained that he would expect to find DNA from

Moore, M.D., and A.D. on the items because they all sometimes slept in the same bed. (*Id.*)

{¶ 16} The final prosecution witness was Amy Ferguson, a family-services coordinator at Michael's House, where she was employed through Dayton Children's Hospital. (*Id.* at 603.) Ferguson testified that she conducted forensic interviews with A.D. on June 20, 2017 and July 18, 2017 following a referral from the Xenia police department. (*Id.* at 613-614.) Ferguson stated that the questions she asked and the responses A.D. gave were for the purpose of medical diagnosis and treatment. (*Id.* at 626.) More specifically, she testified that the questions and answers would be "forwarded * * * to both mental health and medical for purposes of evaluation for both of those." (*Id.*) The trial court allowed the jury to view a recording of the first interview while Ferguson narrated it.

{¶ 17} During the first interview, A.D. reported that Moore had pulled down her pants and rubbed her buttocks with his hand. She stated that he sometimes would roll her on her side, pull down her pants, and "put his thing inside her private and more it back and forth." (*Id.* at 628.) She also told Ferguson that Moore sometimes "would put his hand under her shirt and squeeze and rub her boobs" or would touch her vagina with his finger. (*Id.* at 628-630.) A.D. additionally told Ferguson about a time when Moore put his penis in her vagina while her mother, M.D., was taking a shower. (*Id.* at 631.) A.D. recalled a night when Moore had sex with her in her mother's bed before getting up, leaving the room, and then coming back and having sex with her a second time. (*Id.* at 638.) A.D. then described an incident when Moore put his finger in her vagina and moved it around. (*Id.*) A.D. also recalled a time in Kentucky when Moore touched her vagina with his finger and another time when he put his foot in her "private" in her mother's bed. (*Id.* at 639-

640.) In addition, A.D. "talked about a time where he would have her take her hand and physically put her hand on his penis and move her hand around on his penis. As well as times in the old house where he put his penis in her mouth." (*Id.* at 640.) At one point during the interview, Ferguson took a break to consult with the observers in the other room, presumably including law enforcement, to see whether they had "any follow up questions." (*Id.* at 641.)

{¶ 18} With regard to the second interview on July 18, 2017, Ferguson testified that she did not obtain any additional, significant information. (*Id.* at 618.) She reiterated that the information she obtains from forensic interviews goes to a physician for possible medical treatment and to mental health professionals for possible psychological treatment. (*Id.* at 644.)

{¶ 19} Following Ferguson's testimony, the State rested its case. (*Id.* at 647.) The State then requested and obtained the dismissal of several counts of the indictment. (Id. at 691-706.) As to the remaining counts, the trial court overruled a motion for judgment of acquittal. (*Id.* at 715-723.) The jury found Moore guilty on all remaining charges (counts 1-4, 7-10, 13-14, and 17-19). The trial court imposed an aggregate prison sentence of 108 years to five life terms. This appeal followed.

{¶ 20} In his first four assignments of error, Moore challenges the trial court's admission into evidence of statements A.D. made to various people. His first assignment of error concerns Ferguson's testimony about what A.D. told her and the recording that was played for the jury. Citing *State v. Arnold*, 126 Ohio St.3d 296, 2010-Ohio-2742, 933 N.E.2d 775, and *State v. Remy*, 2d Dist. Clark No. 2017-CA-6, 2018-Ohio-2856, Moore contends the primary purpose of Ferguson's interviews was forensic information

gathering, not medical diagnosis or treatment. Therefore, he asserts that the challenged evidence was hearsay and not admissible under Evid.R. 803(4), which provides a hearsay exception for statements made for purposes of medical diagnosis or treatment.

{¶ 21} Hearsay challenges to a trial court's admission of statements from children in sex-abuse cases are reviewed under an abuse-of-discretion standard. *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 48. The Ohio Supreme Court has defined "abuse of discretion" as an "unreasonable, arbitrary, or unconscionable use of discretion, or as a view or action that no conscientious judge could honestly have taken." *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 67. Most often, an abuse of discretion will produce a decision that is unreasonable, not unconscionable or arbitrary. A decision is unreasonable if it is not supported by a sound reasoning process. *State v. Pettiford*, 2d Dist. Montgomery No. 27490, 2019-Ohio-892, ¶ 15.

{¶ 22} Here the record reflects that Ferguson was employed by Dayton Children's Hospital and placed at Michael's House, a child-advocacy center. (Tr. at 603-604.) Ferguson described a child-advocacy center as a "one-stop shop for a child with allegations of maltreatment." (*Id.* at 605.) The purpose is to have a child come to one location "to be seen there by all those parties who have an interest in what the child might say." (*Id.*) Such parties might include "children's services, law enforcement, victim advocacy, prosecution, mental health and the medical component." (*Id.* at 606.) Although one or more representatives of law enforcement watched Ferguson's two interviews with A.D. from another room, Ferguson testified that the primary purpose of Michael's House was not to obtain a criminal conviction. She explained that the primary purpose was "to meet with the child, [hear] what they have to say about what has or has not happened in

their lives to ensure their safety and overall wellbeing as well as to have referrals for any type of services that they may need." (*Id.* at 607.)

{¶ 23} Ferguson testified that she conducted two "forensic interviews" with A.D., one on June 20, 2017 and the second on July 18, 2017. (*Id.* at 613-614.) She described a forensic interview as "a mutual fact finding conversation with a child conduct[ed] in a multi-disciplinary—it's a multi-disciplinary approach to maltreatment." (*Id.* at 608-609.) According to Ferguson, such an interview "is done in a non-leading way. It's a conversation that is conducted in a narrative style so the child can tell us in their own words what's going on with open-ended questions." (*Id.* at 609.) Ferguson stated that she made a referral for mental-health counseling for A.D. after the first interview. (*Id.* at 617.) She also made a referral for A.D. to be examined at Dayton Children's Hospital. (*Id.*) The record reflects that Dr. Liker received the referral from Michael's House and reviewed a summary of Ferguson's forensic interview as well as A.D.'s emergency-room record before examining the child in July 2017. (Tr. at 455, 463-464, 467.) Ferguson's summary included "the types of contact" that A.D. had disclosed.[1] (*Id.* at 467.) With regard to Ferguson's second interview, she testified that she did not obtain any significant additional information. (*Id.* at 618.) At trial, Ferguson did not testify about the substance of the second interview, and the jury did not view the recording of it. (*Id.* at 618, 663.)

{¶ 24} Over Moore's objection, the trial court did allow the State to play a recording

---

[1] For purposes of Dr. Liker's testimony about her medical examination of A.D., the State indicated it did not offer the information obtained from Michael's House for the truth of the matter asserted. The State offered the information "to give the jury some insight as to why the doctor's examination proceeded the way it did." (Tr. at 467.) Without objection, however, the State did offer A.D. statements during the doctor's examination for the truth of the matter asserted on the basis that the child's statements to Liker were for medical diagnosis or treatment. (*Id.* at 468-469, 471-473.)

of Ferguson's first interview with A.D. (*Id.* at 618, 626.) Partially because A.D. was soft-spoken, the trial court permitted Ferguson to narrate and to summarize what A.D. said during the interview. Moore did not object to this procedure. (*Id.* at 635-636.) Roughly a quarter of the hour-long interview involved rapport-building that included discussion of A.D.'s family and her participation in sports. After that, Ferguson and A.D. discussed the allegations of sexual abuse by Moore for approximately 35 minutes. The last portion of the interview included a five-minute break and discussion of A.D. worrying about not being a virgin any longer and her prior fears of becoming pregnant (which did not occur). The discussion of sexual abuse during the middle of the interview involved disclosures by A.D. about numerous instances of Moore touching her and engaging in various forms of sexual activity with her. A.D. described the incidents and provided contextual details, including, among other things, the rooms in which the acts occurred and in which house, the physical layout of the house, whether anyone else was in the room or in the house, what Moore said during the incidents, Moore "moaning" while performing sex acts and taking out his penis and holding it, and whether Moore sometimes thought A.D. was asleep.

{¶ 25} In *Remy*, 2d Dist. Clark No. 2017-CA-6, 2018-Ohio-2856, this court recently considered whether statements made by child sex-abuse victims were admissible under Evid.R. 803(4) as statements made for purposes of medical diagnosis or treatment. *Remy* involved three young children who had been sexually abused by their stepfather. After disclosing the abuse, they underwent forensic interviews at a child-advocacy center. The trial court found the children's statements admissible under Evid.R. 803(4). On appeal, this court first noted that "[i]n determining whether statements made to a forensic interviewer at a child advocacy center are made for the purpose of medical diagnosis and

treatment, as opposed to forensic investigative purposes, the court must 'identify the primary purpose of the statements.' " *Remy* at ¶ 82, citing *Arnold,* 126 Ohio St.3d 296, 2010-Ohio-2742, 933 N.E.2d 775, at ¶ 28. This court then found that the trial court had erred in admitting the children's statements under Evid.R. 803(4) but that the error was harmless, reasoning:

> Based on the evidence before us, the primary purpose of [social worker] Lowe's forensic interviews with D.C., J.C., and K.C. was for forensic information-gathering, not for the purpose of medical diagnosis and treatment. The interviews were coordinated with law enforcement personnel, Detective Fent observed the interviews from an observation room, and Lowe consulted with Detective Fent prior to completing the interviews that the detective attended. The interviews were not conducted in a medical facility or through referrals from a medical facility, and there is no indication that the children gave the statements for purposes of obtaining a medical diagnosis or treatment. Although referrals to physicians and counselors were made following certain interviews, the primary goals stated by Lowe were information-gathering for child safety, not to provide immediate medical (physical or mental health) care and diagnosis.

> Although the recorded videos of Lowe's interviews were objectionable, we nevertheless conclude, upon review of the entire record, that their admission was harmless. As with the statements in [another trial witness's] recordings, the allegations by the children in the challenged interviews with Lowe were repeated to other medical professionals and/or

therapists. Accordingly, the content of the children's statements would have been before the jury even absent the video-taped interviews. In addition, even without the video-recordings, Lowe would have been permitted to testify about the demeanor of the children during the interviews and to the referrals that were made as a result of the girls' statements during the interviews. Arguably, Lowe might have been permitted to testify about some of the girls' allegations to explain why the referrals were made, but not for the truth of the allegations themselves.

*Id.* at ¶ 90-91.

{¶ 26} In *Arnold*, the Ohio Supreme Court also considered the admissibility of statements made during interviews at child-advocacy centers. *Arnold* involved a Confrontation Clause challenge rather than Evid.R. 803(4), but the pertinent inquiry was the same. The issue in *Arnold* was whether a child's statements during an interview were for medical diagnosis or treatment, making them "non-testimonial," or whether they primarily served a forensic or investigative purpose, making them "testimonial" in violation of the defendant's confrontation rights. In addressing this issue, the Ohio Supreme Court recognized that child-advocacy centers are unique insofar as a single interview with a child serves "dual purposes," which are: "(1) to gather forensic information to investigate and potentially prosecute a defendant for the offense and (2) to elicit information necessary for medical diagnosis and treatment of the victim." *Arnold* at ¶ 33. The majority then turned to the substance of the child's interview. It reasoned that some of the child's statements primarily had a forensic or investigative purpose. They included the child's assertion that the defendant had "shut and locked the bedroom door before raping her;

her descriptions of where her mother and brother were while she was in the bedroom with Arnold, of Arnold's boxer shorts, of him removing them, and of what Arnold's 'pee-pee' looked like; and her statement that Arnold removed her underwear." *Id.* at ¶ 34. The Ohio Supreme Court reasoned that "[t]hese statements likely were not necessary for medical diagnosis or treatment. Rather, they related primarily to the state's investigation." *Id.*

{¶ 27} The *Arnold* court also found, however, that "other statements provided information that was necessary to diagnose and medically treat" the child victim. *Id.* at ¶ 37. It noted that "[t]he history obtained during the interview is important for the doctor or nurse practitioner to make an accurate diagnosis and to determine what evaluation and treatment are necessary. For example, the nurse practitioner conducts a 'head to toe' examination of all children, but only examines the genital area of patients who disclose sexual abuse. That portion of the exam is to identify any trauma or injury sustained during the alleged abuse." *Id.* In particular, the Ohio Supreme Court held that the following statements by the victim during the interview were necessary for medical diagnosis or treatment: "statements that described the acts that Arnold performed, including that Arnold touched her 'pee-pee,' that Arnold's 'pee-pee' went inside her 'pee-pee,' that Arnold's 'pee-pee' touched her 'butt,' that Arnold's hand touched her 'pee-pee,' and that Arnold's mouth touched her 'pee-pee.' " *Id.* at ¶ 38. The fact that the victim already had undergone a "rape-kit examination" did not dissuade the majority from finding that the foregoing statements were necessary for subsequent medical diagnosis or treatment. *Id.* at ¶ 39. The majority also found nothing objectionable about considering the child's statements individually to determine which ones were for medical diagnosis or treatment and to exclude those that were not. *Id.* at ¶ 42. Finally, the Ohio Supreme Court found

nothing objectionable about the fact that police watched the interview or the fact that information obtained for medical purposes ultimately was used to prosecute the defendant. These considerations did "not change the fact" that some of the child's statements "were made for medical diagnosis and treatment." *Id.* at ¶ 43.

{¶ 28} In *State v. Warman*, 12th Dist. Butler No. CA2016-02-029, 2017-Ohio-244, the Twelfth District applied *Arnold* in a case involving a recording of an interview at a child-advocacy center. After reviewing the child's statements during the interview, the Twelfth District concluded that some of them were admissible under Evid.R. 803(4) and some were not. Although the trial court in *Warman* had allowed the jury to see a video of the entire recorded interview, the Twelfth District held that the introduction of the inadmissible statements was harmless error. It reasoned:

> With respect to KG6's interview, the video was over an hour long and was played in its entirety for the jury. The video begins with [social worker's] Colliers asking general questions of KG6 regarding safety. Colliers later asks KG6 questions concerning her knowledge about male and female anatomy, and asked her to identify body parts, including genitalia, on anatomically correct depictions of a nude girl and boy. Eventually, Colliers asks KG6 about the ring pop game. KG6 tells Colliers she played the ring pop game "one time" at a "drive-thru." She identifies where she was located in the car when she played the game and where her siblings were located. She describes how Warman tried to play the ring pop game with her sister. She tells Colliers that Warman told her not to tell her mommy about the ring pop game. She describes seeing Warman's penis. She also states that she

had to put a shirt around her eyes and that Warman told her to "duck" [i.e., bend over toward his pants]. Finally, she states that Warman told her to taste some food on his penis but she forgot what kind of food it was.

Under *Arnold*, KG6's statements concerning the specifics of the sexual act she performed, i.e., how many times she did it, her physical interaction with his penis, and "ducking," were primarily for the purpose of medical treatment. However, the remaining information in the interview, including where the car was located, where she and her siblings were situated in the car, and that she had a shirt around her eyes were statements drawn from her primarily for a forensic or investigative purpose. Because these statements were not primarily for medical diagnosis or treatment they should not have been admitted under the Evid.R. 803(4) hearsay exception.

Accordingly, some of the statements KG6 made in the interview did not fall under the hearsay exception for medical diagnosis or treatment, and therefore the admission of those statements was error to the extent that they were offered to prove the truth of the matter they asserted. However, such error was harmless as the state presented ample evidence other than the video-recorded interview to sustain Warman's conviction for the rape of KG6. * * * As will be discussed in greater detail in the next assignment of error, KG6 testified concerning the ring pop game and graphically described how Warman raped her. Her testimony was far more descriptive than what she discussed with Colliers during the interview. Accordingly, we are

convinced that the jury necessarily relied on KG6's testimony rather than her recorded statements in concluding that Warman was guilty of raping her.

*Warman* at ¶ 50-52.

**{¶ 29}** Having reviewed the recording of Ferguson's first interview with A.D., which was the only one shown to the jury, we find that it is similar to the interviews at issue in *Arnold* and *Warman*. The record supports a finding that the primary purpose of some of A.D.'s statements was for medical diagnosis or treatment, and we certainly cannot say such a conclusion was an abuse of discretion. Although A.D. already had undergone a sexual-assault-kit examination by nurse-examiner Kelly Azzam shortly after the last incident of abuse, the information Ferguson obtained during the interview at Michael's House was forwarded to Dr. Liker, who received the referral and used the information when conducting a more complete medical examination. Based on our review of the record, the trial court did not act unreasonably to the extent that it allowed the jury to hear A.D.'s statements to Ferguson about specific sex acts Moore performed on her. Those statements referenced multiple instances of vaginal intercourse, oral sex, contact between Moore's penis and A.D.'s "butt," and touching of her breasts and vagina. The trial court acted within its discretion in concluding that the primary purpose of these statements was medical diagnosis or treatment.[2]

---

[2] We note too that A.D. testified at trial and provided substantially similar testimony about Moore engaging in numerous and varied sex acts with her over a period of years. In addition, Dr. Liker testified without objection about A.D. stating during her medical examination that Moore had put "his private part in hers" and "that his private part also made contact with her butt and with her mouth." (Tr. at 468.) The parties agreed that A.D.'s statements to Dr. Liker were admissible as statements made for medical diagnosis or treatment. (*Id.* at 471-473.)

{¶ 30} We believe the trial court erred, however, insofar as it allowed the jury to hear all of A.D.'s statements to Ferguson. For example, A.D.'s statements about the physical location of the abuse and the layout of the house, the presence of anyone else, what Moore said or sounds he made while performing sex acts, and whether A.D. was asleep all appear to have been elicited and made primarily for investigatory purposes. These sorts of contextual statements were not reasonably necessary for medical diagnosis or treatment and, therefore, were not admissible under the Evid.R. 803(4) hearsay exception. As the Twelfth District did in *Warman*, however, we find that the trial court's admission of these non-medical statements constituted harmless error. For purposes of Moore's convictions, the key aspects of A.D.'s testimony were her disclosures of specific acts of sexual abuse he committed, not the rooms in which they occurred, who else was home at the time, what Moore might have said, or other things. In addition, A.D. testified at trial and provided most of the same contextual details that the jury heard on the recording. For these reasons, we are firmly convinced that the trial court's admission of the hearsay statements in Ferguson's interview with A.D. was harmless and did not impact the jury's verdict.

{¶ 31} Finally, our analysis herein is not inconsistent with our recent opinion in *Remy*. In that case, we concluded that the primary purpose of the child-advocacy center interviews, as a whole, was forensic information-gathering, not medical diagnosis or treatment. Although *Remy* mentioned unspecified "referrals" being made, the connection between the children's statements and their use for medical diagnosis or treatment was much less clear than in the present case. As set forth above, Dr. Liker testified that she actually used the information obtained by Ferguson when conducting a subsequent

medical examination of A.D.

**{¶ 32}** We note too that in the *Remy* opinion cited by Moore and discussed above, this court did not attempt to parse the children's statements to determine whether the primary purpose for *some* of them might have been medical diagnosis or treatment. Instead, we simply conducted a harmless-error analysis. As illustrated by *Arnold* and *Warman*, however, it is also appropriate to consider a child's statements one-by-one to see whether any of them fit within the Evid.R. 803(4) hearsay exception. In fact, in a second *Remy* case not cited by Moore, this court addressed the same interviews in the context of the children's mother's appeal from her own convictions related to her husband's abuse.[3] In *State v. Remy*, 2018-Ohio-2857, 117 N.E.3d 916 (2d Dist.), we explicitly recognized that "some statements" made during the children's interviews at the child-advocacy center "may have been made for purpose of treatment" and, thus, may not have been objectionable on hearsay grounds. *Id.* at ¶ 64-65 (acknowledging that not all of the children's statements at the child-advocacy center were necessarily subject to exclusion as hearsay and recognizing that some of the statements may have been related to medical treatment). That is precisely what we have found in Moore's case.

**{¶ 33}** Having determined that the critical aspects of A.D.'s statements to Ferguson were properly admitted under Evid.R. 803(4) and that the trial court's erroneous admission of other hearsay statements by A.D. during her interview at the child-advocacy center constituted harmless error, we overrule Moore's first assignment of error.

---

[3] On appeal, Moore cites *State v. Remy*, 2d Dist. Montgomery No. 2017-CA-6, 2018-Ohio-2856, which involved the children's stepfather's appeal. The second case is *State v. Remy*, 2018-Ohio-2857, 117 N.E.3d 916 (2d Dist.), which involved the children's mother's appeal from her conviction on related charges.

{¶ 34} In his second assignment of error, Moore challenges the trial court's admission of testimony about disclosures A.D. made to L.M., her father's girlfriend. Moore claims L.M.'s testimony about A.D.'s allegations of sexual abuse constituted inadmissible hearsay. He argues that the trial court erred in finding that A.D.'s statements to L.M. qualified as excited utterances under Evid.R. 803(2).

{¶ 35} As set forth above, A.D. called L.M. into the kitchen to talk while at her father's house. According to L.M., A.D. disclosed that her pants were down when she woke up the previous night. (Tr. at 237.) A.D. stated that her vagina felt "different," and she told L.M. that "it was Tony." (*Id.* at 238.) L.M. and A.D. then left and drove toward the child's mother's house. While in the car, L.M. inquired whether Moore and A.D. had engaged in sexual intercourse. According to L.M., the child put her head down and stated that they had, that it was not the first time, and that it first happened when she was 10 years old. (*Id.* at 256.)

{¶ 36} At trial, Moore challenged the foregoing testimony on the basis of hearsay. After hearing argument, the trial court found A.D.'s disclosures to L.M. admissible as excited utterances. In support, it relied on *In re S.H.W.*, 2d Dist. Greene No. D44918, 2016-Ohio-841, a case it found to be "pretty much on four corners with the facts" in Moore's case. (*Id.* at 253.)

{¶ 37} In *S.H.W.*, the victim, D.R., was a five-year-old boy. The defendant was a teen-aged babysitter who sexually abused the victim on one occasion in a library bathroom. At trial, the victim's mother, M.R, testified about him acting strangely the evening after the abuse and complaining about a painful bowel movement. *Id.* at ¶ 5. She described her son as "lethargic," and she noted that he remained "temperamental" and

"distant" over the next few days. *Id.* She also observed him stroking his penis. *Id.* Five days after the abuse, the victim told his mother that he was "going to put his penis in her butt." *Id* at ¶ 6. When the victim's mother asked where he had heard something like that, he proceeded to disclose that the defendant had taken him into a library bathroom and had performed sexual acts. *Id.* The trial court held that the child's statements to his mother qualified as excited utterances under Evid.R. 803(2).

{¶ 38} On appeal, this court agreed with the trial court. We noted that for a statement to be admissible under the excited-utterance exception to the hearsay rule, four requirements must be met: " '(1) the occurrence of an event startling enough to produce a nervous excitement in the declarant; (2) a statement made while still under the stress of excitement caused by the event; (3) a statement related to the startling event; and (4) the declarant's personal observation of the startling event.' " *Id.* at ¶ 20, quoting *State v. Abner*, 2d Dist. Montgomery No. 20661, 2006-Ohio-4510, ¶ 69. We also noted that "[t]he excited utterance exception to the hearsay rule should be applied liberally in a case involving the sexual abuse of a young child. *State v. Boston*, 46 Ohio St.3d 108, 118, 545 N.E.2d 1220 (1989). This is based upon the age of the child, the shocking nature of the act, and the surprising nature of the assault." *Id.* at ¶ 22. Addressing the passage of time, we observed:

> The passage of time between the event and the child's out-of-court statement, while obviously a factor, is not dispositive. Even when the statement is made after a substantial lapse of time, it may be admitted under the excited-utterance exception. [*State v.*] *Taylor*, 66 Ohio St.3d 295, 303-304 (1993). Where a young child claims to have been the victim of a sexual

assault, the test for admission of the child's statements does not focus upon the progression of the startling event or occurrence, but upon the spontaneous nature of the child's statement. *State v. Huntley*, 2d Dist. Montgomery No. 23545, 2010-Ohio-6102, ¶ 35. Children are likely to remain in a state of nervous excitement longer than would an adult, and therefore it has been held that admission of statements of a child regarding sexual assault may be proper under the excited utterance exception even when they are made after a substantial lapse of time. *Taylor*, 66 Ohio St.3d 295, 304 (1993). The Ohio Supreme Court also held in *Taylor* that there is no per se amount of time after which a statement can no longer be considered to be an excited utterance; the central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may not be a result of reflective thought. *Id.*

*Id.* at ¶ 23.

{¶ 39} After setting forth the applicable standards in *S.H.W.*, we reasoned as follows:

Upon review, we agree with the trial court and find that D.R.'s statements to his mother were not the product of leading and/or coercive questioning on the part of M.R. Significantly, the record establishes that the following statements made by D.R. to his mother were spontaneous and not the result of any type of questioning: 1) "my penis is a turtle, it goes in and out of its shell;" 2) "my penis is a groundhog, it goes into the hole;" and 3) "I'm going to put my penis in your butt." All three of the statements made by

D.R. related to a startling event, were spontaneously uttered, and regarded a subject matter ordinarily foreign to a young child. Moreover, upon hearing D.R. state that he was "going to put [his] penis in [her] butt," M.R. simply asked the child where he had previously heard that phrase because he had never said anything like that before. D.R. responded by asking M.R., "if I tell you, will you forget?" When M.R. responded by reassuring him that she would, in fact, "forget," D.R. told her what S.H.W. had done to him. M.R. did not ask D.R. any leading questions, nor does the record establish that she coerced D.R. into telling her about the sexual assault committed by S.H.W.

M.R. further testified that in the days after the sexual assault occurred and before he informed her of the incident, D.R. was acting "defeated" and as if "something was troubling him." M.R. testified that D.R., who was usually very bright and energetic, acted very angry and emotionally volatile, stating that he "hated [him]self" on at least one occasion. M.R. testified that during a trip to the zoo in the following week after the assault occurred, D.R. stated that he wanted to run out in front of a train that ran around the property and kill himself. Coupled with his emotionally volatile behavior, D.R.'s request that M.R. "forget if he told what happened" establishes that he was still under the stress of the shocking event when he made the statements to his mother. Accordingly, neither M.R.'s non-coercive follow-up questions, nor the passage of approximately five days, destroyed the spontaneity and nervous excitement of D.R.'s statements regarding the event. Thus, the trial court did not err when it

admitted D.R.'s statements to M.R. as excited utterances pursuant to Evid.R. 803(2).

*S.H.W.* at ¶ 24-25.

{¶ 40} Having reviewed *S.H.W.*, we find significant factual distinctions between that case and the present one. The child victim in that case was five years old. The sexual abuse that occurred was a one-time event. The evidence established that the child remained under the stress and excitement of that startling event when he disclosed the abuse to his mother. Moreover, given his young age and apparent inability to understand exactly what had occurred, his disclosures do not appear to have been the product of any reflective thought.

{¶ 41} In contrast to *S.H.W.*, the victim in the present case, A.D., was 13 years old at the time of her initial disclosure. The alleged abuse had been occurring regularly for years. While we recognize the severe emotional damage that such long-term abuse can cause, the stress and nervous excitement resulting from the last episode of Moore's repetitive abuse of A.D. could be viewed differently from the stress and nervous excitement existing in a five-year-old boy who experienced a single shocking episode and did not fully comprehend it.

{¶ 42} We note too that A.D. does appear to have engaged in reflective thought before making her disclosures. L.M. testified that A.D. normally had an "outgoing" and "bubbly" personality. On the evening before her disclosure, however, A.D. was "quiet," had "a blank stare," and would not really make eye contact with L.M. (Tr. at 221.) While braiding L.M.'s hair in the living room, A.D. brought up the subject of Moore, stating that he got on her nerves and that she did not want to stay at her mother's house anymore.

(*Id.* at 222, 229.) At that point, A.D.'s father asked whether Moore had touched her. (*Id.* at 230.) A.D. did not respond and kept braiding L.M.'s hair. (*Id.*) After she finished, A.D. then made a decision to go into the kitchen by herself. A minute or two later, she called for L.M. and disclosed what Moore had done. (*Id.* at 231.) L.M. testified that A.D. "seemed scared, confused on what to do next, if she was doing the right thing." (*Id.* at 240.) In her own testimony, A.D. explained that she told L.M. because "I just felt like I could talk to her about stuff." (*Id.* at 62.)

{¶ 43} The foregoing facts suggest that A.D. reflected on her disclosure to L.M. before making it. On the other hand, she plainly was troubled in the living room, and she purposely brought up the subject of Moore herself. She did not respond, however, when her father asked where Moore had touched her. Instead, she went into the kitchen by herself for a short time, apparently working up the courage to call for L.M., with whom she felt more comfortable. A.D.'s actions that evening were understandable, but the question is whether she made her disclosures while under stress and excitement caused by a startling event of the last incident of years of abuse, rather than as a result of reflective thought. Accepting that the excited-utterance exception to hearsay should be applied "liberally" in cases involving sexual abuse of "young children," we cannot say the trial court's application of the exception here was unreasonable.

{¶ 44} Even if we were to conclude that the trial court abused its discretion in allowing L.M. to testify about A.D.'s disclosures, we agree with the State's alternative argument that any error was harmless beyond a reasonable doubt. L.M.'s testimony about A.D.'s initial disclosures in the kitchen and in the car was relatively insignificant in light of A.D.'s own extensive trial testimony about numerous sexual acts Moore performed on her

over a period of years. Because the jury heard much more directly from A.D. than it heard from L.M., the outcome at trial hinged primarily on the jury's assessment of A.D.'s credibility. We are firmly convinced that the jury's verdict would have been the same without L.M.'s testimony. In addition, we note that A.D.'s statements to L.M. in the kitchen about her pants being down and about Moore being involved addressed only the final incident of sexual abuse. The DNA from semen found in A.D.'s underwear constituted overwhelming evidence of Moore's involvement in that offense. For these reasons, the trial court's admission of L.M.'s testimony about A.D.'s disclosures would constitute harmless error, if error at all. The second assignment of error is overruled.

{¶ 45} In his third assignment of error, Moore claims the trial court erred in allowing A.D.'s mother, M.D., to testify about what the child told her regarding sexual abuse. Moore claims what the child told her mother constituted inadmissible hearsay.

{¶ 46} Moore's assignment of error addresses only one statement by the child. M.D. testified that she spoke to A.D. on the telephone the evening of the child's initial disclosure and asked, "[D]id Tony try to touch you?" (Tr. at 384.) M.D. testified that A.D. started crying and responded, "[Y]es, mommy it's true." (*Id.*) Defense counsel objected on the basis of hearsay. The trial court overruled the objection, finding the child's response to be an excited utterance. (*Id.* at 384-386.) On appeal, Moore argues: "The statement was clearly hearsay. It was not spontaneous. The statement was made after the leading, coercive and suggestive question by her mother. The statement should not have been allowed." (Appellant's brief at 14.)

{¶ 47} Upon review, we agree with Moore that A.D.'s disclosure to her mother was inadmissible hearsay. Even taking into account the relaxed rules applicable to disclosures

by child sex-abuse victims, we are unpersuaded that A.D.'s statement to her mother about Moore touching her constituted an excited utterance. Once again, however, we also agree with the State's alternative argument that the admission of M.D.'s testimony about A.D.'s disclosure was harmless beyond a reasonable doubt. In light of A.D.'s own detailed testimony about Moore sexually abusing her many times, the jury's verdict undoubtedly would have been the same regardless of M.D.'s testimony about A.D. saying "yes" when asked whether Moore had touched her. We again note the DNA evidence, unrelated to and undiminished by any hearsay, which constituted overwhelming evidence of Moore's sexual conduct with A.D. The third assignment of error is overruled.

{¶ 48} In his fourth assignment of error, Moore claims the trial court erred in allowing police officer Rebecca Lilje to testify about A.D.'s allegations of sexual abuse. As set forth above, Lilje spoke to A.D. at the child's mother's house on the evening of the initial disclosure. At trial, Lilje described A.D. as appearing "nervous" as they began to talk about Moore. (*Id.* at 548.) When Lilje attempted to testify about what the child claimed had occurred, defense counsel objected on the basis of hearsay. (*Id.* at 548-549.) The trial court overruled the objection without specifying the basis for its ruling.[4] (*Id.* at 551.) Lilje proceeded to testify about A.D.'s allegations regarding the incident the previous night. (*Id.* at 552-553.)

{¶ 49} Unlike his first three assignments of error, Moore's fourth assignment of error does not raise a hearsay argument. Instead, he contends only that the trial court

---

[4] On appeal, Moore contends the trial court admitted A.D.'s statements as excited utterances. The trial court did not indicate the basis for its ruling, however, and the State presented two arguments for admissibility: (1) the excited-utterance exception to hearsay and (2) the statements were prior consistent statements to rebut a charge of recent fabrication. (Tr. at 549-551.)

should have excluded A.D.'s statements to Lilje because they were "testimonial" in nature. (Appellant's brief at 14-15.) In support, he cites *State v. Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, which involved a Confrontation Clause challenge to a child's statements made in response to police questioning. The State properly notes, however, that the admission of a declarant's out-of-court statements does not violate the Confrontation Clause where the declarant testifies at trial and is subject to full and effective cross examination. *Remy*, 2018-Ohio-2857, 117 N.E.3d 916 (2d Dist.), ¶ 40-41. Because A.D. testified at trial and was subject to extensive cross examination, no Confrontation Clause violation occurred. The fourth assignment of error is overruled.

{¶ 50} In his fifth assignment of error, Moore challenges the trial court's decision to allow leading questioning of A.D. about anal intercourse allegations.

{¶ 51} The record reflects that A.D. responded "yes" when asked whether Moore ever had put his penis in her "butt." The child stated that she could not remember "the times" it had happened or where it had occurred. (Tr. at 91.) The prosecutor then asked for permission to ask leading questions, explaining that the child previously had provided more details about such incidents. (*Id.* at 92.) After taking an off-the-record break, the trial court appears to have allowed limited leading questioning, although its ultimate ruling is not on the record. (*Id.* at 92-96.) In any event, the prosecutor proceeded to question A.D. about incidents of anal sex with Moore. (*Id.* at 96-101.)

{¶ 52} Contrary to Moore's argument, however, few of the prosecutor's questions accurately can be characterized as leading. "A leading question is 'one that suggests to the witness the answer desired by the examiner.' " (Citation omitted) *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 149. Most of the prosecutor's

questions to A.D. involved a specific area of inquiry and were binary in nature in the sense that they called for a "yes" or "no" answer. But the vast majority of the questions did not suggest which answer the prosecutor desired. Nor did the prosecutor embed an answer in the question. We have recognized that a question calling for a "yes" or "no" answer but not suggesting the answer is not leading. *State v. Taylor*, 2d Dist. Montgomery No. 20944, 2006-Ohio-843, ¶ 47, 56. To the extent any leading questioning did occur, trial courts have wide latitude in handling such matters, particularly in cases involving alleged child sex-abuse victims. *State v. Howard*, 2d Dist. Montgomery No. 26360, 2015-Ohio-3917, ¶ 43. Having reviewed the record, we see no abuse of discretion in the trial court's handling of the issue. The fifth assignment of error is overruled.

{¶ 53} In his sixth assignment of error, Moore maintains that "cumulative error" deprived him of a fair trial. He asserts that the alleged evidentiary errors discussed above, even if individually harmless, constituted prejudicial error when aggregated.

{¶ 54} It is true that separately harmless errors may violate a defendant's right to a fair trial when the errors are aggregated. *State v. Madrigal*, 87 Ohio St.3d 378, 397, 721 N.E.2d 52 (2000). To find cumulative error, we first must find multiple errors committed at trial. *Id.* at 398. We then must find a reasonable probability that the outcome below would have been different but for the combination of separately harmless errors. *State v. Thomas*, 2d Dist. Clark No. 2000-CA-43, 2001 WL 1103328, *9 (Sept. 21, 2001).

{¶ 55} Here we have found two instances of separately harmless error—the trial court's admission of hearsay testimony from A.D.'s mother and and its admission of certain statements made by A.D. at the child-advocacy center that did not qualify as statements made for medical diagnosis or treatment. As explained in our analysis of the

previous assignments of error, the improperly admitted testimony was relatively brief and insignificant (hearsay testimony from A.D.'s mother) or was largely repetitive of A.D.'s own extensive testimony about Moore's sexually abusing her for years (A.D.'s statements at the child-advocacy center that did not pertain to medical diagnosis or treatment). Even when the improperly admitted testimony is viewed cumulatively, we find no reasonable probability the jury's verdict would have been different if it had been excluded. Accordingly, the sixth assignment of error is overruled.

{¶ 56} In his seventh assignment of error, Moore challenges the legal sufficiency of the evidence to sustain his convictions for gross sexual imposition and rape. His entire argument is as follows:

> The substantive evidence presented against appellant on all charges was weak. There was no medical evidence presented at trial linking appellant to these sex offenses. The testimony of "A.D." was inconsistent with the account she provided medical personnel when she went to Dayton Children's Hospital. The convictions are also based upon the admission of hearsay testimony which was improperly admitted. Specifically, count three, a gross sexual imposition charge, was based solely upon the testimony of Amy Ferguson, the forensic interviewer not "A.D." Ms. Ferguson stated the appellant put his hand on A.D.'s breast. Count eighteen, the anal sex allegation, only came about due to the improper leading questions of appellee's trial counsel.

(Appellant's brief at 17-18.)

{¶ 57} When a defendant challenges the sufficiency of the evidence, he is arguing

that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471, 741 N.E.2d 594 (2d Dist.2000). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶ 58}** With the foregoing standards in mind, we conclude that Moore's convictions for gross sexual imposition and rape were supported by legally sufficient evidence. A.D.'s testimony alone was legally sufficient to support all but two of the convictions.[5] Although Moore suggests the child's testimony lacked credibility, the test for legal sufficiency is whether the State's evidence, *if believed*, supports the convictions. Moore also suggests that insufficient evidence remains if certain challenged evidence is excluded from consideration. When considering a challenge to the legal sufficiency of the evidence, however, we must consider all of the evidence presented at trial, regardless of whether it was admitted erroneously. *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284, ¶ 17-20. In any event, we determined above that the evidence he challenges

---

[5] In its brief, the State concedes that the only evidence supporting two of the counts of gross sexual imposition was testimony from Amy Ferguson regarding A.D.'s disclosures at Michael's House. (Appellee's brief at 13.) In our analysis of Moore's first assignment of error, however, we held that the trial court properly admitted A.D.'s statements to Ferguson about the acts of sexual touching that supported the gross sexual imposition charges.

was not improperly admitted. Finally, we note again that DNA evidence supported one of the rape convictions, and the lack of medical evidence for any of the other convictions does not negate the legal sufficiency of the evidence to support them. The seventh assignment of error is overruled.

{¶ 59} In his eighth assignment of error, Moore contends his gross sexual imposition and rape convictions were against the manifest weight of the evidence. His entire argument is as follows:

In this case *sub judice*, all of appellant's convictions for gross sexual imposition and rape should be reversed and a new trial ordered. The substantive evidence brought [against] appellant was thin. There [were] no medical findings supporting the rape convictions despite the fact that appellant allegedly repeatedly raped "A.D." "A.D." gave medical personnel a different version of events from what she testified to. "A.D."'s motive for fabrication was to get her parents back together. The semen in her underwear could have been caused by masturbatory emission.

(Appellant's brief at 18-19.)

{¶ 60} When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only

in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 61}** With the foregoing standards in mind, we conclude that Moore's convictions were not against the weight of the evidence. Although he complains about the lack of "medical findings" to support the allegations of sexual abuse, Dr. Liker testified that it is common for female children to have "normal" medical examinations after oral, anal, or vaginal sex, and she explained why that was so. (Tr. at 456-460.) Liker opined that "[u]pwards of 90 to 95 percent of children have normal exams when they're evaluated for sexual abuse[.]" (*Id.* at 489.) As for A.D.'s testimony, Moore's assignment of error cites no specific inconsistencies or discrepancies. Although consideration of witness credibility is proper in the context of a manifest-weight analysis, credibility remains primarily an issue for the jury. *State v. Boehme*, 2d Dist. Montgomery No. 27255, 2017-Ohio-8246, ¶ 18. Here the jurors' verdicts make clear that they found A.D.'s allegations credible. Having reviewed A.D.'s testimony, we find nothing that would cause us to conclude that the jurors lost their way in reaching this conclusion. As for Moore's argument about A.D. having a motive to lie and the semen found in her underwear conceivably resulting from him masturbating, these issues primarily were for the jurors to consider. Again, the jury did not clearly lose its way and create a manifest miscarriage of justice in finding Moore guilty. The evidence does not weigh heavily against his convictions. The eighth assignment of error is overruled.

**{¶ 62}** Moore's ninth, tenth, and eleventh assignments of error relate to sentencing. His ninth assignment of error challenges the trial court's imposition of consecutive sentences. His tenth assignment of error challenges the trial court's

imposition of statutory maximum sentences on each count. His eleventh assignment of error alleges cruel and unusual punishment in violation of the Eighth Amendment to the U.S. Constitution based on the maximum sentences he received for gross sexual imposition and rape.

{¶ 63} When reviewing felony sentences, appellate courts apply the standard of review found in R.C. 2953.08(G)(2). *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 9. Under that statute, an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if it "clearly and convincingly" finds either (1) that the record does not support certain specified findings or (2) that the sentence imposed is contrary to law.

{¶ 64} "The trial court has full discretion to impose any sentence within the authorized statutory range, and the court is not required to make any findings or give its reasons for imposing maximum * * * sentences." *State v. King*, 2013-Ohio-2021, 992 N.E.2d 491, ¶ 45 (2d Dist.). However, a trial court must consider the statutory criteria that apply to every felony offense, including those set out in R.C. 2929.11 and R.C. 2929.12. *State v. Leopard*, 194 Ohio App.3d 500, 2011-Ohio-3864, 957 N.E.2d 55, ¶ 11 (2d Dist.), citing *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, ¶ 38.

{¶ 65} Although statutory maximum sentences do not require any of the findings specified in R.C. 2953.08(G)(2), the Ohio Supreme Court has found it appropriate "for appellate courts to review those sentences that are imposed solely after consideration of the factors in R.C. 2929.11 and 2929.12 under a standard that is equally deferential to the sentencing court. That is, an appellate court may vacate or modify any sentence that is not clearly and convincingly contrary to law only if the appellate court finds by clear and

convincing evidence that the record does not support the sentence." *Marcum* at ¶ 23.

{¶ 66} Before imposing consecutive sentences, a trial court must make the findings required by R.C. 2929.14(C)(4). Specifically, a trial court must determine that: (1) consecutive service is necessary to protect the public from future crime or to punish the offender; (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) at least one of the following findings is satisfied:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 67} Prior to sentencing Moore, the trial court reviewed sentencing memoranda and heard arguments from counsel. Moore declined to make any statement on his own behalf. A.D. and her father made short victim-impact statements. (Tr. at 813-816.) The trial court reviewed Moore's criminal history and recited only those offenses it found

"notable," including child endangering, receiving stolen property, possession of drug paraphernalia, domestic violence, felony theft, criminal damaging, another domestic violence, criminal non-support, obstructing official business, and a third domestic violence. The trial court also noted that Moore had served two prior prison terms. Defense counsel did not dispute this criminal history. (*Id.* at 817-818.)

**{¶ 68}** The trial court proceeded to indicate that it had considered the statutory principles and purposes of sentencing as well as the statutory seriousness and recidivism factors. (*Id.* at 819.) It then provided the following explanation for its sentencing decision:

The Court further finds that after considering the factors set forth in O.R.C. 2929.12 a prison term is consistent with the purposes and principles of sentencing set forth in 2929.11 and the Defendant is not amenable to available community control sanction[s].

The Court further finds that a combination of community control sanctions would demean the seriousness of the Defendant's conduct and its impact on the victim; and that a prison sentence is commensurate with the seriousness of Defendant's conduct and its impact on the victim; and that a prison sentence does not place an unnecessary burden on state or governmental resources.

The Court further finds that consecutive sentences are necessary to protect the public from future crime or to punish the offender; and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger that the offender poses to the public; and at least two of the multiple offenses were committed as part of one or

more courses of conduct and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct; and the offender's conduct and history of criminal conduct demonstrate that consecutive sentences are necessary to protect the public from future crime by the offender.

Specific findings: The Court notes that the Defendant has multiple prior felony convictions in his history, including a felony of violence; and multiple violent misdemeanor convictions, including convictions of Endangering Children and Domestic Violence. Moreover, in this instance the Court finds the Defendant raped a child of less than 13 years of age and committed multiple offenses, to wit, Gross Sexual Imposition in violation of O.R.C. 2907.05(A)(4), multiple violations of Rape in violation of O.R.C. 2907.02(A)(1)(B) and Rape in violation of O.R.C. 2907.02(A)(1). The evidence reveals that the Defendant committed the most repugnant, hedonistic sexual acts forced upon a child who was under the age of 13 during many of these acts. It is the Court's judgment that upon review of the evidence and exhibits that the facts justify the finding of consecutive sentencing.

Furthermore, the Defendant possesses [sic] a direct and imminent threat to the public with no realistic probability of rehabilitation. The evidence in this case proved unequivocally that Anthony Moore is an

extreme threat to the innocence and safety of children who are in his presence. Immediately upon taking residence with [M.D.] and her children Defendant began grooming [the] 11 year old victim hereafter known as A.D. for abuse. He subjected her to a deliberate and repetitive pattern of gross sexual imposition that quickly escalated to a regular pattern of rape. He was a constant predatory presence in her life to the point that she could not even enjoy a night's sleep without the fear and dread of Defendant sneaking into her room to abuse and defile her while robbing her of her innocence and the safety of her home and family. These heinous crimes cannot be minimized and will not go unpunished. It is the Court's intention and responsibility to ensure that Anthony Moore never again be alone in the presence of any child.

(*Id.* at 821-824.)

**{¶ 69}** With regard to the trial court's imposition of consecutive sentences, Moore acknowledges in his ninth assignment of error that the requisite statutory findings were made. He argues only that the record does not support those findings. His entire substantive argument is as follows:

In the case *sub judice*, the trial court's imposition of consecutive maximum sentences was a "trial tax." The trial court's imposition of consecutive sentences is also an improper message for any defendant not to take a case to jury trial and lose. In this case, appellee made no plea offers. Appellee was not required to do so. Given the state's sentencing position and the trial court's sentencing, why wouldn't anyone not take a

case to a jury trial.

According to appellant's indictment, appellant is thirty-seven (37) years of age. The trial court did not request a presentence report. Appellant has a criminal history, but the trial court and this appellate court have seen much worse. There were no prior sex offense convictions. A sentence far less than 108 years would accomplish the same after considering the factors in R.C. 2929.12 and the purposes and principles of sentencing set [forth] in R.C. 2929.11. Appellant is not Moses. A sentence of 108 years to life is akin to a death sentence.

Lastly, the trial court put great emphasis in its belief that appellant imposed a great threat to all children while imposing the 108 year sentence. The trial court apparently forgot that it was also imposing duties on appellant as a Tier III sex offender which would protect children.

(Appellant's brief at 21-22.)

**{¶ 70}** The foregoing argument fails to establish that the record clearly and convincingly does not support consecutive sentences. As for the "trial tax" issue, Moore cites absolutely nothing suggesting that the trial court imposed consecutive sentences to punish him for taking his case to trial. He correctly points out that his decision to do so was reasonable given that the State declined to make any plea offer. We see no evidence that the trial court punished him for not pleading guilty as charged without any concessions. Therefore, we find no grounds for a "trial tax" argument. Nor do we see any basis for an argument that the trial court improperly sent a message to other defendants not to take their cases to trial.

{¶ 71} As for Moore's criminal history, the trial court reasonably considered it. Although his criminal history is not the worst we have seen, it is significant. It appears to us, however, that the trial court's consecutive-sentencing decision was driven largely by what Moore did to A.D. over a period of years. She testified that he sexually abused her well before she was 13 years old. The abuse, which included acts of rape, occurred "almost every day" when she lived on Lowell Road. (Tr. at 68.) After she moved to Atkinson Drive, the abuse occurred "every couple nights." (*Id.*) Based on A.D.'s testimony, the trial court could have inferred that Moore engaged in hundreds of sex acts with her. He committed some of the acts while A.D.'s mother was in the shower or asleep in the same bed with A.D. and Moore.

{¶ 72} Given the brazen nature of Moore's conduct over an extended period of time, the trial court reasonably concluded that he posed a "direct and imminent threat to the public with no realistic probability of rehabilitation" and that he should "never again be alone in the presence of any child." Contrary to Moore's argument, his aggregate minimum 108-year sentence is not "akin to a death sentence." Rather, it is a sentence that assures he will remain in prison for the remainder of his life. The record does not clearly and convincingly fail to support the trial court's findings.

{¶ 73} Finally, we are unpersuaded by Moore's argument that designating him a Tier III sex offender adequately would protect the public. Recidivism by a sex offender can occur despite sex-offender registration requirements. In light of the reckless and bold nature of Moore's acts, the trial court reasonably could have feared that designating him a Tier III sex offender would not adequately protect the public. Moore's ninth assignment of error is overruled.

{¶ 74} In his tenth assignment of error, Moore challenges the individual maximum sentences he received. He does not suggest that any of those sentences are contrary to law. In essence, his argument is that the record clearly and convincingly does not support maximum sentences on any counts and that minimum sentences would suffice. His entire argument is as follows:

> Appellant's arguments for this assignment of error as for the previous assignment of error overlap. A minimum sentence on each count would protect the public from future crimes by appellant and punish appellant using the minimum sanctions that the court determines accomplishes those purposes without imposing an unnecessary burden on state or local government resources.
>
> Appellant is thirty-seven (37) years of age. He has some criminal history. Appellant has a supportive family. The trial court did not have the benefit of a presentence investigation report.

(Appellant's brief at 23.)

{¶ 75} Upon review, we find Moore's argument to be unpersuasive. For essentially the same reasons that the trial court did not err in imposing consecutive sentences, it did not err in imposing statutory maximum sentences. In light of Moore's criminal history and the facts and circumstances of his offenses against A.D., we do not find that the record clearly and convincingly fails to support his individual maximum sentences. The tenth assignment of error is overruled.

{¶ 76} In his eleventh assignment of error, Moore alleges cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution based on the maximum

sentences he received. He argues that each of the individual sentences was grossly disproportionate to his conduct with regard to each offense. In support, he asserts that he did not cause physical harm to A.D., that A.D. did not report any major mental- or emotional-health issues when she spoke at sentencing, and that he is not aware of any victim-impact statements.

{¶ 77} Upon review, we find Moore's allegation of cruel and unusual punishment to be unpersuasive. " '[A]s a general rule, a sentence that falls within the terms of a valid statute cannot amount to a cruel and unusual punishment.' " *State v. Hairston*, 118 Ohio St.3d 289, 2008-Ohio-2338, 888 N.E.2d 1073, ¶ 21, quoting *McDougle v. Maxwell*, 1 Ohio St.2d 68, 69, 203 N.E.2d 334 (1964). "[W]e are bound to give substantial deference to the General Assembly, which has established a specific range of punishment for every offense[.]" (Citation omitted.) *Id.* at ¶ 24.

{¶ 78} Here each of Moore's individual sentences falls within the range authorized by Ohio law. In addition, we concluded in our resolution of his tenth assignment of error that his individual maximum sentences are not clearly and convincingly unsupported by the record. In light of these facts, we are unpersuaded that the maximum sentences rise to the level of cruel and unusual punishment. We disagree with Moore's assertion that the maximum sentences are grossly disproportionate to his conduct in this case. In reaching this conclusion, we note that proportionality review under the Eighth Amendment does not apply to his aggregate sentence. Rather, for cruel-and-unusual-punishment purposes, proportionality review applies only to individual sentences. *State v. Hand*, 2d Dist. Clark No. 2016-CA-51, 2017-Ohio-7340, ¶ 15-16, citing *Hairston* at ¶ 14, 20. Gross disproportionality exists under the Eighth Amendment when an individual sentence is

conscience shocking to a reasonable person and to a community's sense of justice. *Id.* We do not find Moore's sentence to be conscience-shocking. The eleventh assignment of error is overruled.

{¶ 79} Having overruled each of Moore's assignments of error, we affirm the judgment of the Greene County Common Pleas Court.

. . . . . . . . . . . . .

DONOVAN, J. and FROELICH, J., concur.

Copies sent to:

Nathaniel R. Luken
David R. Miles
Hon. Michael A. Buckwalter