[Cite as *State v. Hawkins*, 2021-Ohio-3373.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 29013 |
| | : | |
| v. | : | Trial Court Case No. 2019-CR-3177 |
| | : | |
| LUTHER HAWKINS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 24th day of September, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ELIZABETH A. ELLIS, Atty. Reg. No. 0074332, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

LUCAS W. WILDER, Atty. Reg. No. 0074057, P.O. Box 574, Dayton, Ohio 45409
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1}   Luther Hawkins appeals from his convictions, following a bench trial, on one count of rape (Count 1 - under 13, by force), in violation of R.C. 2907.02(A)(1)(B), a felony of the first degree, and ten counts of rape (force or threat of force), in violation of R.C. 2907.02(A)(2), also felonies of the first degree.   The court sentenced Hawkins to 25 years to life (mandatory) on Count 1 and to four years each (mandatory) for the remaining counts, all to be served consecutively, for an aggregate term of 65 years to life.   The court also classified Hawkins as a Tier III sex offender.   We will affirm the judgment of the trial court.

{¶ 2} The victim of the alleged offenses was Hawkins's stepdaughter, who disclosed the abuse to her mother in the spring of 2019.   Hawkins was indicted on six counts of rape (under 13, by force) on October 11, 2019.   The court entered a not guilty plea on Hawkins's behalf, and Hawkins filed a motion to suppress on December 19, 2019. On January 2, 2020, the Montgomery County Department of Job and Family Services, Children Services Division, filed a motion to quash Hawkins's subpoena seeking the records of M.S., the victim herein.   This motion to quash was later granted after an in camera review of the records.

{¶ 3} On January 10, 2020, Hawkins filed several notices and motions.   He filed a notice of intent to introduce evidence of M.S.'s sexual history, with a request for a hearing. He also filed a motion in limine to prohibit the State from introducing text messages he had alleged sent to his ex-wife, the victim's mother, which included "a series of comments" by Hawkins regarding his "unrelated and immaterial sexual activities with other women." Finally, Hawkins filed a motion in limine to exclude evidence of his ex-wife's sexually transmitted disease (STD) and evidence of M.S.'s alleged STD or "speculation as to its

origin."

{¶ 4} In July 2020, after a hearing, the court issued an order denying in part and sustaining in part Hawkins's motions in limine. The court noted that the parties had stipulated to Defendant's Exhibit 1, which consisted of the police report from the Dayton Police Department, text messages allegedly sent from Hawkins to his ex-wife, and M.S.'s medical records. The court concluded that evidence of M.S.'s prior sexual history was "unduly inflammatory and prejudicial" and would not be admitted at trial. The court found, however, that evidence of M.S.'s mother's sexually transmitted disease was relevant pursuant to Evid.R. 403(A) and that its probative value was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or of misleading the jury. The court reserved the right to reconsider its ruling if Hawkins were not provided medical information in the State's possession pertaining to this issue. Regarding the text messages sent to M.S.'s mother by Hawkins, the court concluded that, in light of M.S.'s prior sexual activity, the specific messages were inflammatory and that their potential prejudice outweighed their probative value. The court reserved its ruling on Hawkins's use of any of M.S.'s alleged psychological history because it was unable to discern what materials Hawkins sought to use.

{¶ 5} On October 14, 2020, Hawkins filed a pro se request that a subpoena duces tecum be issued for both two individuals, other than Hawkins, with whom M.S. allegedly engaged in sexual activity, "to pin point the 'origin of disease' and to prepare for a fair trial."

{¶ 6} In November 2020, Hawkins waived his right to a jury trial, and a bench trial commenced.

**{¶ 7}** D.H., M.S.'s mother and Hawkins's ex-wife, testified that she and Hawkins were married in March 2012, after dating for five months; shortly after they were married, they moved to an address on Hollenkamp Avenue. D.H.'s two daughters, M.S. and T.G., lived with them, but the girls were not related to Hawkins. D.H. stated that M.S. had been born in December 2002 and T.G. had been born in 2008. D.H. testified that she and Hawkins also had a daughter together, L.H., who was born in 2014. D.H. stated that she and Hawkins resided on Hollenkamp for about five years, then moved to Quentin Avenue, where they resided for two years, and then moved to Fifth Street and resided there until March 2019.

**{¶ 8}** According to D.H., Hawkins initially acted like a father toward M.S., but M.S. "would always have an attitude" around him. D.H. also stated that Hawkins exhibited a temper around the children. She testified that Hawkins had been alone with M.S. when she was at work, when she was in the hospital giving birth to L.H., and when she was in the hospital for 11 days another time. D.H. stated that, in March 2019, while in the car with M.S., M.S. began to cry "a hard cry like an emotional [one]," and D.H. "could tell something was wrong at that point." M.S. then told D.H. that Hawkins had been raping her.

**{¶ 9}** D.H. testified that she took M.S. to Children's Hospital on May 10, 2019. At that time, D.H. learned for the first time that M.S. had been previously diagnosed with chlamydia. D.H. had also been previously diagnosed with chlamydia on March 15, 2019, while married to Hawkins, and up to that point, she had not been sexually active with anyone else but him.

**{¶ 10}** On cross-examination, D.H. testified that M.S. never disclosed sexual

abuse to her (D.H.) or to her own (M.S.'s) doctor while D.H. and Hawkins were together, and that D.H. never observed inappropriate behavior between Hawkins and M.S. D.H. stated that M.S. had exhibited behavioral problems in school and was often in trouble. For example, when M.S. was in the ninth grade and the family lived on Fifth Street, M.S. often skipped class to be with her friends in the school hallways. D.H. also stated that, in the 2017-2018 school year, M.S.'s grades were all F's and one C, and her grade point average was 0.15.

{¶ 11} M.S. was 17 years old and in the eleventh grade at the time of trial. She testified that she had been eight years old when she met Hawkins and that, initially, they did "a lot of family things," like bowling, skating, and shopping. When the prosecutor asked M.S., to outline her school years, she described them as follows: According to M.S., she went to ninth grade for the first time during the 2017-2018 school year at Belmont High School, when she was 14-15 years old; she lived on Fifth Street at that time. M.S. stated that she repeated ninth grade at Summit Academy during the 2018-2019 school year when she was 15-16 years old; she also lived on Fifth Street at that time. Previously, M.S. had attended eighth grade at Horizon Science Academy from 2016-2017, when she was 13-14 years old and lived on Quentin Avenue; attended seventh grade at Pathway in 2015-2016 when she was 12-13 years old and lived on Hollenkamp Avenue; and attended fourth, fifth and sixth grade in 2012-2015 at World of Wonder when she was 9-12 years old and lived on Hollenkamp Avenue.

{¶ 12} M.S. testified that Hawkins abused her "from fifth grade to ninth grade" when she lived on Hollenkamp Avenue, Quentin Avenue, and Fifth Street. M.S. stated that, when she was 11 and living on Hollenkamp Avenue, on a sunny day when her family was

outside, Hawkins pulled her into a room and kissed her with a "tongue kiss," but she did not tell anyone about it. M.S. stated that, a couple of weeks later, while she was in D.H.'s room with Hawkins, he "put his mouth on my vagina basically"; she stated that her clothes were on, but Hawkins had pulled her pants down. According to M.S., she "was on the bed and he was like off the bed at the end of the bed." When asked if Hawkins's mouth "was doing anything or moving," M.S. responded affirmatively.

{¶ 13} M.S. testified that Hawkins also put his mouth on her vagina in "[her] room, the back room, maybe" at the Hollenkamp address. She testified:

Q [PROSECUTOR]. Can you tell the Court everything you remember about that time it happened in your room?

A [M.S.]. I don't remember - -

Q. You don't remember a lot?

A. No.

Q. Were your pants on or off?

[DEFENSE COUNSEL]: Objection. Leading.

BY [THE PROSECUTOR]:

Q. Or something else?

[THE PROSECUTOR]: I guess that makes it not leading.

THE COURT: Sustain the objection. Rephrase - -

BY [THE PROSECUTOR]:

Q. That time in your room that he put his mouth on your vagina - - let me ask it this way.

Was it skin-to-skin contact?

[DEFENSE COUNSEL]: Objection. Leading.

THE COURT: Overruled.

BY [THE PROSECUTOR]: Did his mouth directly touch the skin of your vagina?

A. Yes.

[DEFENSE COUNSEL]: Objection. Leading.

THE COURT: Overruled. She never answered the first question actually so. Re-ask the first question (indiscernible).

BY [THE PROSECUTOR]:

Q. So that second time, in your room, were your pants - - were your clothes on or off or something else?

A. They were off.

Q. * * * How did they get off that time?

A. I really don't remember.

Q. You don't remember - -

A. (Indiscernible)

Q. - - how they got off, but you remember that they got off.

A. Yes.

Q. Is that correct?

A. Yes.

Q. * * * So is it accurate to say that there was nothing between his mouth and your vagina?

[DEFENSE COUNSEL]: Objection. Leading.

THE COURT:   Overruled.

* * *

Q.   Is it accurate to say there was nothing between his mouth and your vagina?

A.   Right.

Q.   * * * Was it similar to that first time?   Was his mouth doing something on your vagina?

A.   Yes.

{¶ 14} M.S. stated that Hawkins had also engaged in anal sex with her at the Hollenkamp Avenue address:

Q.   He used his private on your butt?

A.   Yes. * * *

Q.   * * * Did it touch on the outside?   Did his private go inside?

A.   It went inside.

Q.   Inside.

[DEFENSE COUNSEL]:   Objection.   Leading.

THE COURT:   Overruled.

BY [THE PROSECUTOR]: * * * And when you say his private, what part of his body do you mean by that?

A.   His penis.

Q. * * * Did that happen one time on Hollenkamp or more than one time when you lived on Hollenkamp?

A.   More than one time.

* * *

Q.   Can you tell me where that happened?

A.   It would be in my mom's room or in my room.

Q.   When that would happen - - tell me everything you remember about it happening.

A.   (Indiscernible) he used Vaseline basically.

* * *

Q.   Did he put it on someone's body?

A.   Yes.

    [DEFENSE COUNSEL]:   Objection.   Leading.

    THE COURT:   Overruled.

BY [THE PROSECUTOR]:

Q.   Whose body did he put it on?

A.   His and mine basically.

{¶ 15} M.S. stated that she had been on her stomach with Hawkins behind her, and that it had been painful.   She stated that it happened both during the day and at night when D.H. was at work or out of the house.

{¶ 16} M.S. further testified:

Q.   Did he ever ask you to touch his body or did he have you do anything to his body?

A.   Yes (indiscernible).

* * *

A.   Put my mouth on his private part - -

* * *

Q.  Penis?

A.  Yes.

Q.  * * * Did his penis go inside your mouth?

    [DEFENSE COUNSEL]:  Objection.  Leading.

    THE COURT:  Overruled.

THE WITNESS:  Yes.

BY [THE PROSECUTOR]: * * * On Hollenkamp, did that happen one time or more than one time?

A.  More than one time.

Q.  What room did that happen in?

A.  The back room, my room, their room.

* * *

Q.  Did you tell him no or did you try to stop any of this?

A.  I would say (indiscernible) the second one where he put his private in my butt, that's when I would tell him no.

{¶ 17} M.S. stated that when Hawkins put his penis in her mouth on Hollenkamp Avenue, she "had [her] mouth closed," but Hawkins forced it in, and that he had his hand on "him and on my head."

{¶ 18} When discussing the abuse at Quentin Avenue, M.S. testified:

Q. * * * When you lived on Quentin, did [Hawkins] ever put his mouth on your vagina?

A.  Yes.

Q.  Did it happen one time or more than one time on Quentin?

A.  More than one time.

[DEFENSE COUNSEL]:  * * * Leading, Your Honor.

* * *

THE COURT: * * * Overruled.

[THE PROSECUTOR]:  What rooms on Quentin would that happen in?

A.  Their room, living room.

Q.  When you lived on Quentin, did he put his penis in your butt?

A.  No.

Q.  Did he do anything similar?

A.  Basic like humping.

* * *

Q.  Tell me about that when he would hump you.

* * *

THE WITNESS:  Sometimes it'll be in the middle of the night and I wake up and he's on top of me while I'm laying on my stomach.  Like say if I was laying on the couch or something like that.  But his penis (indiscernible) basically like touching my skin.

BY [THE PROSECUTOR]:

Q.  So his penis would be touching your skin.

A.  Yeah.

Q.  But when you lived on Quentin, it didn't go inside.

A.  * * * No, it did not.

Q. * * * And what about him putting his penis in your mouth?   Did that happen on Quentin?

A.   Yes.

[DEFENSE COUNSEL]:   Objection.   Leading.

THE COURT:   Overruled.

* * *

Q.   Did it happen more than one time?

A.   More than one time.

Q.   And what rooms would that happen in when he would put his penis in your mouth on Quentin?

A.   My room, their room and living room.

{¶ 19} M.S. testified that Hawkins continued to abuse her at the Fifth Street residence.   She stated that Hawkins put his mouth on her vagina there more than one time in her room and "their room."   Her testimony continued:

Q.   Did he put his penis in your butt - -

A.   No.

Q. - - on Fifth?

[DEFENSE COUNSEL]:   Objection.   Leading.

THE COURT:   Overruled.

{¶ 20} M.S. also testified:

Q.   On Fifth Street, when he put his penis in your mouth, did it happen one time or more than one time?

A.   More than one time * * *

Q. Would you still try to close your mouth?

A. Yes.

{¶ 21} As illustrated by some of these excerpts from the trial transcript, defense counsel objected throughout the prosecutor's direct examination on the basis that the State was leading M.S. throughout her testimony with "yes or no answers," which counsel described as "classic leading," and "with leading this witness to testify as they want her to." Defense counsel moved for a mistrial. The prosecutor disagreed that the questions had been leading, stating that "the victim was the first to bring up each of the sexual acts. Those were not suggested to her. But once she introduces those it is proper to ask her if they happened more than once and if they happened in more than one location. And the fact that she is able to delineate and answer 'no' to some of these really establishes they're not leading questions and she's not easily led by them." The trial court denied the motion for a mistrial. It pointed out that the State had started by asking if these events did, in fact, occur; its questions did not surmise that the actions took place.

{¶ 22} When asked if any other sexual activity occurred on Fifth Street, M.S. responded: "[p]enetration and like taking my virginity." She testified that Hawkins "put his penis in my vagina" in "their room" when she was 14 years old and D.H. was in the hospital. M.S. stated that she told Hawkins that it was painful and told him to stop. She further testified:

Q. Were you crying?

A. Yeah - -

[DEFENSE COUNSEL]: Objection. Leading.

THE WITNESS: Yes, I was.

THE COURT: Overruled.

* * *

Q. Did he - - before he put his penis in your vagina, before he took your virginity, had he ever tried anything like that before?

A. No.

Q. No?

That first time he tried it, he put his penis in your vagina?

 Yes.

[DEFENSE COUNSEL]: Leading.

THE COURT: Sustained.

* * *

Q. * * *

Were there any other times that he put his penis in your vagina or was this the only time?

* * *

A. No, that wasn't the only time.

Q. * * * Do you know how many times that happened?

A. No, I don't know how many times.

Q. More than once?

A. More than once.

[DEFENSE COUNSEL]: Objection. Leading.

* * *

THE COURT: Overruled.

Q. Were there other rooms it happened in?

A. Yes. The dining room, my room, their room.

Q. When he took your virginity, do you know if he was wearing a condom?

A. No.

> [DEFENSE COUNSEL]: Objection. Leading.
>
> THE COURT: Overruled.

* * *

Q. Okay. On Fifth Street, was there anything else - - any other types of acts that happened?

A. That was all.

{¶ 23} M.S. testified that Dr. Barnes-Lark was her doctor and that she (M.S.) had an appointment with Barnes-Lark in June 2018 to obtain birth control. M.S. testified that Barnes-Lark contacted her after the visit and told her that she had tested positive for chlamydia. M.S. stated that the doctor phoned in a prescription for her and explained that it consisted of two pills; M.S. told Hawkins, and he picked up the prescription, but he only gave her one of the pills. M.S. stated that when she asked for the other pill, Hawkins told her he took the other pill for himself, "for his safety, too, so he won't have anymore either."

{¶ 24} The direct examination of M.S. continued:

Q [PROSECUTOR]. I want to go back, especially to some of these early times.

When we're talking about on Hollenkamp. These first times that it's happening. You said that there were times that you said no. You talked

about saying no when he put his penis in your butt.

  A.  Correct.

Q.  And that didn't get him to stop.

    [DEFENSE COUNSEL]:  Objection.  Leading, argumentative.

    THE COURT:  I'm going to sustain that - -

    [DEFENSE COUNSEL]:  Move to strike.

    THE COURT:  The Court will disregard it.

BY [THE PROSECUTOR]:

Q.  Did you think you had a choice in the matter?

    [DEFENSE COUNSEL]: Objection.

    THE COURT:  Overruled.

    THE WITNESS:  Not at all.

**{¶ 25}** M.S. testified that Hawkins would wake up in the morning "yelling and screaming" because the house was not clean or because he was mad about something else.  She described him as a "drill sergeant" and stated that she was afraid of him.  M.S. testified that she decided to tell her mother (D.H.) about the abuse in March 2019, because they were moving and M.S. "felt like [she] was in a safe place enough to tell her." M.S. stated that after she did so, she felt "relieved," "didn't feel depressed anymore," and felt that "there was a big burden off [her] shoulders."

**{¶ 26}** M.S. testified:

Q {PROSECUTOR}. * * * I know we're talking about a lot of different incidents where this happened.  How would these incidents end?

    [DEFENSE COUNSEL]:  Objection.

THE COURT: Overruled.

THE WITNESS: I don't know what you mean by that.

BY [THE PROSECUTOR]:

Q. Like what would make him stop?

A. I don't know.

\* \* \*

Q. \* \* \* Do you know what it means if I ask you if someone ejaculated?

[DEFENSE COUNSEL]: Objection. Leading.

[THE PROSECUTOR]: I don't think it's leading to ask if it happened. She can say yes or no and she has demonstrated she was able to say no when - -

THE COURT: Counsel approach.

{¶ 27} After a lengthy discussion at sidebar, the court sustained the objection, indicating "it was asked and answered" when M.S. "stated she did not know how these incidents or acts ended," and the prosecution could "move on from there."

{¶ 28} The questioning proceeded as follows:

Q. Were there other times that he did things to you and you cried[?]

[DEFENSE COUNSEL]: Objection. Leading.

THE COURT: Overruled.

THE WITNESS: Yes.

[DEFENSE COUNSEL]: Calls for a yes or no answer, Your Honor.

\* \* \*

THE COURT: It's binary. Objection overruled.

* * *

Q.   Did he ever tell you not to tell anyone?

A.   No.

[DEFENSE COUNSEL]: Objection. Leading.

THE COURT:   Overruled.

{¶ 29} On cross-examination, M.S. acknowledged that, in the course of the police investigation, she told Detective Fehrman that she had also engaged in sexual conduct with two other individuals.   With respect to her disclosure of the abuse to D.H., M.S. testified that she and her mother were in the car, pulling up to their new residence at the end of April 2019 when she disclosed Hawkins's abuse.

{¶ 30} The following exchange occurred:

Q.   Well, as soon as your mom - -

* * *

Q. - - moved you guys to Notre Dame, she got pregnant with Mr. [F.'s] child, correct?

A.   Correct.

Q.   And that's around the same time you made these accusations against Mr. Hawkins, correct?

A.   A couple months later, yes.

Q.   Around the same time you made these accusations against Mr. Hawkins, correct?

A.   Correct.

Q. * * * And you talked with your mother about these accusations,

correct?

A. Correct.

Q. * * * And that was in spite of the fact that he had lived with you guys for seven years before you ever came up with these accusations, correct?

A. Correct.

Q. And that was around the same time your mother wanted to leave him, correct?

A. Right.

{¶ 31} Dr. Ladonna Barnes-Lark testified that she was a physician at the Charles Drew Health Center, that D.H. and M.S. were her patients, and that she had known D.H. since she was five years old and M.S. since birth. Barnes-Lark testified that on June 12, 2018, during a wellness checkup, she ordered that M.S. be tested for sexually transmitted diseases because she was at an age where the doctor "routinely order[ed] STI checks"; M.S. had also complained of abdominal pain. Barnes-Lark stated that her procedure was to obtain the patient's cell phone number, not the parent's, and call the patient when the results came back from the lab. Barnes-Lark testified that M.S. tested positive for chlamydia, and Barnes-Lark called M.S. and told her to take two prescription tablets by mouth to treat the disease. Barnes-Lark further testified that D.H. tested positive for chlamydia in March 2019.

{¶ 32} On cross-examination, Barnes-Lark testified that, although she was a mandatory reporter of suspected abuse, she never had an occasion to contact law enforcement about M.S. when M.S. was between the ages of 11 and 16; M.S. never disclosed any sexual abuse during that time, and D.H. never expressed suspicions about

Hawkins abusing M.S.

{¶ 33} Dina Thurman, a pediatric nurse practitioner at Children's Hospital in the division of child advocacy who was trained to treat cases of childhood sexual abuse, stated that "about 95% of patients" will have no physical exam findings indicative of sexual abuse in the genital or anal region. Thurman stated that she examined M.S. in August 2019, and that M.S. had previously been seen by a physician in the emergency department in May 2019. Thurman stated that, when M.S. was seen in May 2019, "she had an exam that was concerning"; namely, "there was a questionable absence of the hymen at six o'clock" noted by the emergency department physician, and the pediatric sexual assault nurse examiner also documented "an area of concern at the same area." According to Thurman, however, the "child abuse pediatrician" in the child advocacy division reviewed the photo documentation of the genital area from this examination and was unable to see the finding that was documented. The child abuse pediatrician recommended a follow-up medical exam to "better evaluate the findings of concern." Thurman testified that, when she examined M.S. in August 2019, she "was able to clarify * * * that there was a transection meaning an absence of hymenal tissue in the area that was found to be concerning in the emergency department." When asked if she was able to confirm that it was the same area of concern observed in May, Thurman responded that what she observed "was in the exact same location" and was "an absence of hymenal tissue." She explained that a transection "is a finding that is the result of penetration. It * * * can be penetration from various things. It's not a specific finding for abuse but it can be consistent with" abuse. Thurman testified that she asked M.S. if she had had prior consensual sexual activity, and M.S. responded affirmatively. Thurman stated that M.S.

also told her that she had first had sex when she was 14 years old and that M.S. reported having one partner.

{¶ 34} On cross-examination, Thurman testified that, in August 2019, M.S. had reported to her that M.S.'s last voluntary sexual contact had been two years earlier. M.S. told Thurman that she did not know who or what caused the hymenal transection. Thurman acknowledged that M.S.'s anal examination in May 2019 was normal.

{¶ 35} Brenda Miceli, a pediatric psychologist at Dayton Children's Hospital, was designated by the court as an expert in child psychology, "specifically as it pertains to child and physical and sexual abuse." Miceli had never treated M.S., and she testified that her testimony was offered to generally explain the nature of child abuse disclosures. Miceli stated that, with respect to child abuse, "most disclosure takes a while" and is "delayed disclosure as opposed to immediate." Miceli also testified that when someone experiences something multiple times, "it is harder to recall details of a particular incident." She testified that, while children can fabricate abuse, studies show that children often err by "underreporting information as opposed to giving additional information." Miceli stated that abused children generally exhibit three categories of behavior: "internalizing behaviors," such as anxiety and nightmares, depression, and self-harm; "externalizing behaviors," such as aggression, tantrums, and defiance; and "sexualized behaviors." She also stated that some kids describe feeling a sense of relief after they've disclosed.

{¶ 36} The State sought to present the testimony of Melissa Holbrook, a forensic interviewer who interviewed M.S. Defense counsel objected to the testimony, arguing that Holbrook's testimony would constitute "improper bolstering of [M.S.'s] testimony." Counsel asserted that M.S.'s statements during the interview were "testimonial in nature,"

that the interview was "taken at the behest of the Dayton Police Department," and that it was turned over to the Dayton Police Department for evidentiary purposes in preparation for trial. The court overruled the objection.

{¶ 37} Holbrook testified that she was employed by Dayton Children's Hospital as a Family Service Coordinator at CARE House, a child advocacy center. She stated that she conducted forensic interviews and made referrals for medical or mental health purposes. Holbrook stated that the goal was "to provide kids who come into CARE House a holistic approach to protect them or to advocate for them."

{¶ 38} Holbrook stated that a forensic interview is a "neutral," "non-leading" interview that reflects the child's developmental age or status and is conducted by someone who is trained and certified in forensic interviewing. She stated that the goal is to "assess the child's safety" as well as to assess whether the child has been a victim, and to make the appropriate mental health and medical referrals based on that interview.

{¶ 39} Holbrook interviewed M.S. on May 14, 2019, after she was referred to CARE House by the emergency department at Children's Hospital. Holbrook testified that doctors and nurses at the hospital were not trained to conduct forensic interviews. She also testified that M.S. disclosed sexual abuse during their recorded interview. Portions of the interview were played for the court, over defense counsel's objection (State's Exhibit 1).

{¶ 40} According to Holbrook, M.S. was a "very shy, quiet teenager" at the time of their interview. Holbrook stated that their interview was broken into sections: Holbrook initially introduced herself and explained her role and the "setup of the room"; she then tried to build rapport, went over the basic rules of the interview, and learned more about

the child's family and home. Then, in "Stage 2" of the interview, Holbrook talked with the child about brought him or her to CARE House.

{¶ 41} Holbrook stated that M.S. was the first to bring up sexual abuse during Stage 2 of their interview, when Holbrook asked what brought her to CARE House. Holbrook stated that M.S. identified her abuser as her stepdad. Holbrook testified that a child acknowledging being touched is a broad disclosure, and that for purposes of medical referral for further examination, it is relevant to learn the nature of the touching being reported. She also testified that the identity of the abuser may impact the child's safety, noting that Hawkins was living in M.S.'s home prior to the interview.

{¶ 42} Defense counsel objected to Holbrook's "running narrative of the video being played." Although the court noted its prior finding that the video of the interview was admissible because it was non-testimonial and relevant to mental health treatment, it agreed that a particular portion of the video was simply "rehashing" the victim's testimony. The prosecutor asked to play a few more minutes of the video in which additional disclosures were made, but defense counsel strenuously objected. Defense counsel pointed out that Holbrook was neither a doctor nor a nurse, that no medical personnel were present at the interview, and that M.S. had been seen by doctors and nurses at Children's Hospital a few days earlier, so M.S.'s statements could not be viewed as for the purposes of medical diagnosis and treatment under Evid.R. 803(4). However, the court again found that the evidence was admissible; it stated: "there's no way for Ms. Holbrook to even consider providing treatment for the alleged victim for mental health purposes and medical treatment without hearing about the incident that took place." The court also reiterated its finding that the interview was "nontestimonial in nature" and

therefore admissible.

{¶ 43} Holbrook's testimony about the interview continued. Holbrook was asked why, after M.S. reported that Hawkins touched her "private," Holbrook asked clarifying questions about the touching; Holbrook replied that "different things mean different things to kids," and that she (Holbrook) needed to understand what areas M.S. was talking about and what Hawkins used to touch her. According to Holbrook, "the reason we do that is so that we can make sure that there's not anything additionally that she needs to be seen medically for. * * * It could be a follow-up for needing additional lab work or testing done." For example, Holbrook stated that learning that M.S. was touched by Hawkins's mouth helped her assess whether or not the touch was accidental or innocent. She further stated that knowing whether M.S.'s clothes were on or off during the touching could impact potential referrals for treatment.

{¶ 44} A portion of the video reflected that M.S. reported that Hawkins had engaged in anal sex with her. Holbrook stated that a report of anal penetration is conveyed to treating physicians since it may require distinct testing. She also testified that if a victim reports having said no to the abuse, that information could inform a decision whether to refer the child for certain mental health counseling, such as trauma-based counseling. Holbrook further stated that reports of multiple types of sexual activity over a considerable time period further implicate a referral for trauma-based counseling. She stated that M.S.'s description of multiple types of sexual activity over a long period of time was relevant to future referrals.

{¶ 45} Holbrook testified that, after her interview with M.S., she referred M.S. to trauma-based counseling because M.S. reported multiple types of sexual abuse over an

extended period of time. According to Holbrook, M.S. was "very emotional," which contributed to the assessment of the effect on her mental health and the referral for trauma-based counseling.

{¶ 46} On cross-examination, Holbrook acknowledged that, near the end of her interview with M.S., M.S. indicated that she could not have gotten chlamydia from anyone other than Hawkins because she had "never done anything else like this that she had done with" Hawkins. But at that time, Holbrook did not know that M.S. "had done things" with anyone else.

{¶ 47} Holbrook testified that a multidisciplinary team was involved in the forensic interview with M.S., including social workers, forensic interviewers, a medical team, prosecutors, victim advocates, child protection case workers, and law enforcement. She stated that she and M.S. were alone in the interview room in the course of the interview, and that Detective Ferhman of the Dayton Police Department, Melissa Lowe, a caseworker with MCCS, and Jessica Yang, a victim advocate, observed the interview from a separate room via video and audio recording. Holbrook testified that she gave a copy of the interview to Detective Ferhman afterward, "per our protocol."

{¶ 48} Holbrook reiterated that the purpose of the forensic interview was to "assess the child's safety, to discuss any type of victimization that they might've been through or might have witnessed. And then * * * the other purpose is to make sure that there's proper mental health or medical referrals made for any worries or concerns that the child has about themselves or their bodies."

{¶ 49} On redirect examination, when asked why only law enforcement was given a copy of the interview, Holbrook responded, "Per our protocol, the chain of command is

our law enforcement party [sic] of the team and that is to protect the victim."

{¶ 50} Detective Zachary Ferhman of the Special Victims Unit of the Dayton Police Department, which investigates crimes against children, testified that he was one of five officers specifically assigned to CARE House. He responded to Dayton Children's Hospital when M.S. was taken there and, after speaking to responding officers, D.H., and M.S., he informed D.H. that she would be contacted to set up a forensic interview at CARE House. Ferhman testified that he was given the name of Luther Hawkins as a suspect. He stated that he received a copy of the forensic interview, which he kept through his investigation and the presentation of charges, then he gave a copy to the prosecutor to review. He stated that he also receives copies of forensic interviews in which no disclosures of sexual abuse occur.

{¶ 51} At the conclusion of the State's case, and over objection, State's Exhibit 1, the forensic interview, was admitted into evidence pursuant to *State v. Moore*, 2d Dist. Greene No. 2018-CA-14, 2019-Ohio-1671. Defense counsel moved for an acquittal, which the court denied. Hawkins did not call any witnesses.

{¶ 52} As discussed above, Hawkins was found guilty of one count of rape of a child under 13, by force, and ten counts of rape (force or threat of force), all felonies of the first degree. Hawkins was found not guilty of five other counts.

{¶ 53} At sentencing, the court noted that it had considered the purposes and principles of sentencing and the seriousness and recidivism factors. The court found that consecutive sentences were necessary to protect the public from future crime and to punish Hawkins, and that they were not disproportionate to the seriousness of his conduct and to the danger he posed to the public. Thus, it imposed consecutive sentences

totaling 65 years to life.

{¶ 54} Hawkins raises four assignments of error on appeal. For ease of analysis, we will first discuss Hawkins's second assignment of error, which states:

THE FORENSIC INTERVIEW SHOULD NOT HAVE BEEN PLAYED

AT TRIAL.

{¶ 55} Hawkins asserts that the forensic interview was inadmissible hearsay and that no exception to the hearsay rule applied. He also asserts that it was cumulative. He argues that the forensic interview was conducted after M.S. had already been examined by medical professionals, so the argument that the interview was for medical treatment fails.

{¶ 56} The State responds that Hawkins cites no legal authority in support of his position under this assignment of error and that the court did not abuse its discretion when it allowed the State to play the video of the interview. The State relies on *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, and *Moore,* 2d Dist. Greene No. 2018-CA-14, 2019-Ohio-1671. Moreover, the State argues that, even the trial court erred in admitting the forensic interview, the remaining evidence supported Hawkins's convictions, so any error was harmless.

{¶ 57} This court has stated:

We review trial court decisions related to the admission of evidence

for an abuse of discretion. *State v. Glenn*, 2d Dist. Montgomery No. 27639,

2018-Ohio-2326, ¶ 20, citing *State v. Belton*, 149 Ohio St.3d 165, 2016-

Ohio-1581, 74 N.E.3d 319, ¶ 116; *State v. Adams*, 144 Ohio St.3d 429,

2015-Ohio-3954, 45 N.E.3d 127, ¶ 240. "A trial court abuses its discretion

when it makes a decision that is unreasonable, unconscionable, or arbitrary," which "includes a situation in which a trial court did not engage in a 'sound reasoning process.' " (Citations omitted.) *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34. "Abuse-of-discretion review is deferential and does not permit an appellate court to simply substitute its judgment for that of the trial court." *Id.*

In addition, appellate courts "give further deference to a judge's decision [about the admission of evidence] when the evidence is introduced in a bench trial." *State Cty. Park Dist. v. Dickerhoof*, 2018-Ohio-4319, 122 N.E.3d 608, ¶ 49 (5th Dist.), citing *State v. Fautenberry*, 720 Ohio St.3d 435, 439, 650 N.E.2d 878 (1995). "Unless the record indicates otherwise, the judge is presumed to have considered only admissible evidence." *Cleveland v. Welms*, 169 Ohio App.3d 600, 2006-Ohio-6441, 863 N.E.2d 115, ¶ 27 (8th Dist.).

*State v. Sheeders*, 2d Dist. Darke No. 2019-CA-2, 2019-Ohio-3120, ¶ 16-17.

**{¶ 58}** Evid.R. 803(4) provides that the following are not excluded by the hearsay rule: "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

**{¶ 59}** In *Moore*, 2d Dist. Greene No. 2018-CA-14, 2019-Ohio-1671, we discussed the nature of forensic interviews as follows:

In [*State v.*] *Remy*, 2d Dist. Clark No. 2017-CA-6, 2018-Ohio-2856,

this court recently considered whether statements made by child sex-abuse victims were admissible under Evid.R. 803(4) as statements made for purposes of medical diagnosis or treatment. *Remy* involved three young children who had been sexually abused by their stepfather. After disclosing the abuse, they underwent forensic interviews at a child-advocacy center. The trial court found the children's statements admissible under Evid.R. 803(4). On appeal, this court first noted that "[i]n determining whether statements made to a forensic interviewer at a child advocacy center are made for the purpose of medical diagnosis and treatment, as opposed to forensic investigative purposes, the court must 'identify the primary purpose of the statements.' " *Remy* at ¶ 82, citing [*State v.*] *Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, at ¶ 28. This court then found that the trial court had erred in admitting the children's statements under Evid.R. 803(4) but that the error was harmless, reasoning:

> Based on the evidence before us, the primary purpose of [social worker] Lowe's forensic interviews with D.C., J.C., and K.C. was for forensic information-gathering, not for the purpose of medical diagnosis and treatment. The interviews were coordinated with law enforcement personnel, Detective Fent observed the interviews from an observation room, and Lowe consulted with Detective Fent prior to completing the interviews that the detective attended. The interviews were not conducted in a medical facility or through

referrals from a medical facility, and there is no indication that the children gave the statements for purposes of obtaining a medical diagnosis or treatment. Although referrals to physicians and counselors were made following certain interviews, the primary goals stated by Lowe were information-gathering for child safety, not to provide immediate medical (physical or mental health) care and diagnosis.

Although the recorded videos of Lowe's interviews were objectionable, we nevertheless conclude, upon review of the entire record, that their admission was harmless. As with the statements in [another trial witness's] recordings, the allegations by the children in the challenged interviews with Lowe were repeated to other medical professionals and/or therapists. Accordingly, the content of the children's statements would have been before the jury even absent the video-taped interviews. In addition, even without the video-recordings, Lowe would have been permitted to testify about the demeanor of the children during the interviews and to the referrals that were made as a result of the girls' statements during the interviews. Arguably, Lowe might have been permitted to testify about some of the girls' allegations to explain why the referrals were made, but not for the truth of the allegations themselves.

*Id.* at ¶¶ 90-91.

*Moore* at ¶ 25.

**{¶ 60}** This Court further noted as follows:

In *Arnold*, the Ohio Supreme Court also considered the admissibility of statements made during interviews at child-advocacy centers. *Arnold* involved a Confrontation Clause challenge rather than Evid.R. 803(4), but the pertinent inquiry was the same. The issue in *Arnold* was whether a child's statements during an interview were for medical diagnosis or treatment, making them "non-testimonial," or whether they primarily served a forensic or investigative purpose, making them "testimonial" in violation of the defendant's confrontation rights. In addressing this issue, the Ohio Supreme Court recognized that child-advocacy centers are unique insofar as a single interview with a child serves "dual purposes," which are: "(1) to gather forensic information to investigate and potentially prosecute a defendant for the offense and (2) to elicit information necessary for medical diagnosis and treatment of the victim." *Arnold* at ¶ 33. The majority then turned to the substance of the child's interview. It reasoned that some of the child's statements primarily had a forensic or investigative purpose. They included the child's assertion that the defendant had "shut and locked the bedroom door before raping her; her descriptions of where her mother and brother were while she was in the bedroom with Arnold, of Arnold's boxer shorts, of him removing them, and of what Arnold's 'pee-pee' looked like; and her statement that Arnold removed her underwear." *Id.* at ¶ 34. The Ohio Supreme Court reasoned that "[t]hese statements likely were not

necessary for medical diagnosis or treatment. Rather, they related primarily to the state's investigation." *Id.*

The *Arnold* court also found, however, that "other statements provided information that was necessary to diagnose and medically treat" the child victim. *Id.* at ¶ 37. It noted that "[t]he history obtained during the interview is important for the doctor or nurse practitioner to make an accurate diagnosis and to determine what evaluation and treatment are necessary. For example, the nurse practitioner conducts a 'head to toe' examination of all children, but only examines the genital area of patients who disclose sexual abuse. That portion of the exam is to identify any trauma or injury sustained during the alleged abuse." *Id.* In particular, the Ohio Supreme Court held that the following statements by the victim during the interview were necessary for medical diagnosis or treatment: "statements that described the acts that Arnold performed, including that Arnold touched her 'pee-pee,' that Arnold's 'pee-pee' went inside her 'pee-pee,' that Arnold's 'pee-pee' touched her 'butt,' that Arnold's hand touched her 'pee-pee,' and that Arnold's mouth touched her 'pee-pee.' " *Id.* at ¶ 38. The fact that the victim already had undergone a "rape-kit examination" did not dissuade the majority from finding that the foregoing statements were necessary for subsequent medical diagnosis or treatment. *Id.* at ¶ 39. The majority also found nothing objectionable about considering the child's statements individually to determine which ones were for medical diagnosis or treatment and to exclude those that were not. *Id.* at ¶ 42. Finally, the

Ohio Supreme Court found nothing objectionable about the fact that police watched the interview or the fact that information obtained for medical purposes ultimately was used to prosecute the defendant. These considerations did "not change the fact" that some of the child's statements "were made for medical diagnosis and treatment." *Id.* at ¶ 43.

*Moore* at ¶ 26-27.

**{¶ 61}** We further stated in *Moore*:

In *State v. Warman,* 12th Dist. Butler No. CA2016-02-029, 2017-Ohio-244, the Twelfth District applied *Arnold* in a case involving a recording of an interview at a child-advocacy center. After reviewing the child's statements during the interview, the Twelfth District concluded that some of them were admissible under Evid. R. 803(4) and some were not. Although the trial court in *Warman* had allowed the jury to see a video of the entire recorded interview, the Twelfth District held that the introduction of the inadmissible statements was harmless error. It reasoned:

With respect to KG6's interview, the video was over an hour long and was played in its entirety for the jury. The video begins with [social worker] Colliers asking general questions of KG6 regarding safety. Colliers later asks KG6 questions concerning her knowledge about male and female anatomy, and asked her to identify body parts, including genitalia, on anatomically correct depictions of a nude girl and boy. Eventually, Colliers asks KG6 about the ring pop game. KG6 tells Colliers she played the ring pop

game "one time" at a "drive-thru." She identifies where she was located in the car when she played the game and where her siblings were located. She describes how Warman tried to play the ring pop game with her sister. She tells Colliers that Warman told her not to tell her mommy about the ring pop game. She describes seeing Warman's penis. She also states that she had to put a shirt around her eyes and that Warman told her to "duck" [i.e., bend over toward his pants]. Finally, she states that Warman told her to taste some food on his penis but she forgot what kind of food it was.

Under *Arnold*, KG6's statements concerning the specifics of the sexual act she performed, i.e., how many times she did it, her physical interaction with his penis, and "ducking," were primarily for the purpose of medical treatment. However, the remaining information in the interview, including where the car was located, where she and her siblings were situated in the car, and that she had a shirt around her eyes were statements drawn from her primarily for a forensic or investigative purpose. Because these statements were not primarily for medical diagnosis or treatment they should not have been admitted under the Evid.R. 803(4) hearsay exception.

Accordingly, some of the statements KG6 made in the interview did not fall under the hearsay exception for medical diagnosis or treatment, and therefore the admission of those statements was error to the extent that they were offered to prove

the truth of the matter they asserted. However, such error was harmless as the state presented ample evidence other than the video-recorded interview to sustain Warman's conviction for the rape of KG6. * * * As will be discussed in greater detail in the next assignment of error, KG6 testified concerning the ring pop game and graphically described how Warman raped her. Her testimony was far more descriptive than what she discussed with Colliers during the interview. Accordingly, we are convinced that the jury necessarily relied on KG6's testimony rather than her recorded statements in concluding that Warman was guilty of raping her.

*Warman* at ¶¶ 50-52.

*Moore* at ¶ 28.

{¶ 62} We have reviewed M.S.'s recorded interview. It is approximately one hour long, and much of it merely establishes a rapport with M.S. As in *Arnold,* a portion of M.S.'s statements described the sexual acts Hawkins performed on her or required her to perform. Some statements were relevant to medical diagnosis or treatment and, hence, admissible. The trial court specifically relied upon the distinction set forth in *Moore* between statements for purposes of medical diagnosis or treatment and statements made for forensic investigative purposes. In a bench trial, we presume that the trial judge considered only admissible evidence in reaching its verdict, and the record supports a conclusion that the trial court did just that. As discussed above, in response to an objection, the court recognized that a portion of the interview being played was not for purposes of diagnosis and treatment. Even if the court improperly considered

statements elicited primarily for investigatory purposes, given the overwhelming evidence of Hawkins's guilt, as further discussed below, any error was harmless. Accordingly, Hawkins's second assignment of error is overruled.

{¶ 63} We will next consider Hawkins's third assignment of error, which states:

THE TRIAL COURT ABUSED ITS DISCRETION BY ALLOWING THE STATE TO ASK LEADING QUESTIONS OF THE COMPLAINING WITNESS AND TO USE A BOARD AT TRIAL.

{¶ 64} Hawkins asserts that leading questions and use of a "board" at trial violated his right to a fair trial, and that the State's leading questions undermined the verdict because the State essentially testified instead of M.S.

{¶ 65} The State responds that, to the extent any of the identified questions could be considered leading, they were permissible under Evid.R. 611 because they were questions necessary to develop M.S.'s testimony; they either summarized previous testimony, clarified witness responses, or directed a witness's attention to the topic of inquiry.

{¶ 66} Evid.R. 611(C) provides: "Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." "A leading question is 'one that suggests to the witness the answer desired by the examiner.' " (Citation omitted) *Moore,* 2d Dist. Greene No. 2018-CA-14, 2019-Ohio-1671, at ¶ 52, quoting *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 149. This court has recognized that a question calling for a "yes" or "no" answer, but not suggesting the answer, is not leading. *Id.* at ¶ 52, citing *State v. Taylor*, 2d Dist. Montgomery No. 20944, 2006-Ohio-843, ¶ 47, 56. "To the extent any leading

questioning did occur, trial courts have wide latitude in handling such matters, particularly in cases involving alleged child sex-abuse victims. *State v. Howard*, 2d Dist. Montgomery No. 26360, 2015-Ohio-3917, ¶ 43." *Id.* We found no abuse of discretion where the prosecutor's questions "involved a specific area of inquiry and were binary in nature in the sense that they called for a 'yes' or 'no' answer. But the vast majority of the questions did not suggest which answer the prosecutor desired. Nor did the prosecutor embed an answer in the question." *Id.*

{¶ 67} Having reviewed M.S.'s testimony in its entirety, we agree with the State that the prosecutor properly questioned M.S., a young girl who experienced years of sexual abuse at the hands of her stepfather, in a manner necessary to develop her testimony. For example, M.S. was initially asked if Hawkins ever behaved inappropriately, a binary question requiring an affirmative or negative response; after she responded affirmatively, she was asked to describe his conduct without objection. She described how Hawkins had put his mouth on her vagina at the Hollenkamp Avenue address more than once. Defense counsel objected to the State's questions regarding direct contact between Hawkins's mouth and her vagina, but such questions served to develop M.S.'s testimony regarding the abuse. Defense counsel further objected when M.S. was asked if Hawkins's penis had touched the inside or the outside of her body during anal sex; again, the question did not suggest one answer and merely developed M.S.'s testimony about the instances of abuse that she had already disclosed. M.S. stated that Hawkins "put my mouth on his private part," and the court overruled the subsequent objection when the State asked, "[d]id his penis go inside your mouth." It is apparent, given the sequence of the questions, that the State was simply developing

M.S.'s testimony relating to her disclosure of oral sex. We note that the court did not overrule all of defense counsel's objections, as reflected above.

{¶ 68} Moreover, M.S.'s responses indicated that she was able to delineate between the instances of abuse by identifying where they occurred among the relevant addresses, such that she was not being led by the State in her answers. When the State questioned M.S. about the abuse at the Quentin Avenue address, specifically whether Hawkins had engaged in anal sex with her there, she responded in the negative. When asked if Hawkins engaged in anal sex with her on Fifth Street, M.S. again responded in the negative.

{¶ 69} Most significantly, even if the prosecutor had asked any improper leading questions of M.S., "there is a presumption that in a bench trial the trial court relies 'only on relevant, material, and competent evidence in arriving at its judgment.' " *State v. Brodie,* 2d Dist. Montgomery No. 20877, 2006-Ohio-37, ¶ 41, quoting *State v. Lane*, 108 Ohio App.3d 477, 484, 671 N.E.2d 272 (1995). As the fact-finder, the judge was in the best position to discern whether M.S. was telling the truth or whether the State had suggested to her the nature of Hawkins's conduct.

{¶ 70} Finally, we note that the "board" to which Hawkins objects was not admitted into evidence. The record suggests that it was used merely to summarize M.S.'s testimony as to each offense by reference to her address and school year. As the State notes, Hawkins did not object to the use of the chart until it was completed. There is no basis to conclude that the objection had merit or that Hawkins was prejudiced by the "board."

{¶ 71} Based upon the foregoing, Hawkins's third assignment of error is overruled.

{¶ 72} Hawkins's first assignment of error states:

THE STATE DID NOT PRESENT ADEQUATE EVIDENCE TO SUSTAIN THE VERDICTS AND THE VERDICTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 73} Hawkins asserts that the testimony revealed that Hawkins and D.H. were having marital problems at the time of these accusations and that D.H. and M.S. wanted Hawkins "out of their lives for good." He points out that the State did not present any DNA or other forensic physical evidence. Hawkins also points out that M.S. did not report the abuse to her doctor over the years, and M.S.'s mother "did not see, or suspect, anything was wrong." Hawkins questions M.S.'s credibility and suggests that her "bias was evident," given that M.S. lied to Holbrook about her "sexual conduct with two other individuals, her poor performance and behavior at school, her hatred of Hawkins, her desire to have him out of her and her mom's life, [and] the delay (and timing) of the disclosure * * *." According to Hawkins, D.H. was diagnosed with herpes, and he reasons that, if D.H. was having a sexual relationship with Hawkins around the time that Hawkins raped M.S. vaginally, M.S. "would have contracted herpes"; Hawkins concludes that, because M.S. did not get herpes, "it is not medically possible that she was raped vaginally." Hawkins also argues that, although he was convicted of 11 counts of rape, there was no testimony or evidence to support 11 counts of rape.

{¶ 74} In *Moore,* 2d Dist. Greene No. 2018-CA-14, 2019-Ohio-1671, we stated:

When a defendant challenges the sufficiency of the evidence, he is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio

App.3d 449, 471, 741 N.E.2d 594 (2d Dist.2000). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

* * *

When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

*Id.* at ¶ 57, 60.

**{¶ 75}** We have also stated:

The credibility of the witnesses and the weight to be given to their testimony are primarily matters for the trier of facts to resolve. *State v. DeHass,* 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson,* 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley,* 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510 (Oct. 24, 1997).

*State v. Griffith*, 2d Dist. Montgomery No. 26451, 2015-Ohio-4112, ¶ 28.

{¶ 76} R.C. 2907.02 provides:

(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when any of the following applies:

* * *

(b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

* * *

(2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.

{¶ 77} The bill of particulars in this case set forth the following counts of rape of which Hawkins was convicted: pursuant to R.C. 2907.02(A)(1)(b), Count 1 occurred by means of cunnilingus on Hollenkamp Avenue; pursuant to R.C. 2907.02(A)(2), Counts 7 and 8 occurred by means of cunnilingus on Quinten Avenue; Counts 11 and 12 occurred by means of fellatio on Quinten Avenue; Counts 13 and 14 occurred by means of cunnilingus on Fifth Street; Counts 15 and 16 occurred by means of fellatio on Fifth Street, and Counts 17 and 18 occurred by means of penile-vaginal penetration on Fifth Street.

{¶ 78} As set forth above, M.S. testified that a couple of weeks after Hawkins kissed her at the Hollenkamp address, he pulled down her pants and put his mouth on her vagina when she was about 11 years old, in her mother's bedroom (Count 1). M.S. testified that Hawkins put his mouth on her vagina more than one time on Quintin Avenue, in "their room, living room" (Counts 7 and 8). She stated that Hawkins put his penis in her mouth at the Quintin Avenue address more than one time, in "[m]y room, their room, and living room" (Counts 11 and 12). M.S. testified that Hawkins put his mouth on her vagina at the Fifth Street address more than one time, in "[m]y room, their room" (Counts 13 and 14). She stated that he also put his penis in her mouth at the Quentin address more than one time (Counts 15 and 16). Finally, M.S. testified that Hawkins "put his penis in my vagina" on Fifth Street more than once, in the "dining room, my room, their room" (Counts 17 and 18). Thurman described a hymenal transection that as the result of penetration, and M.S.'s delayed disclosure, behavioral problems, and sense of relief

upon disclosure were consistent with Dr. Miceli's general testimony regarding childhood sexual abuse.

{¶ 79} Having examined the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt, we conclude that a rational trier of fact could have found the essential elements of Hawkins's 11 offenses proven beyond a reasonable doubt.   Further, having reviewed the entire record and having weighed the evidence and all reasonable inferences, we cannot conclude that the trial court lost its way in resolving conflicts in the evidence such that Hawkins's conviction must be reversed and a new trial ordered.   The court had the opportunity to observe all the witnesses, and we defer to the trial court's assessment of credibility.   Since Hawkins's convictions were supported by sufficient evidence and were not against the manifest weight of the evidence, his first assignment of error is overruled.

{¶ 80} Hawkins fourth assignment of error states:

THE TRIAL COURT'S SENTENCE OF 65 YEARS TO LIFE WAS CONTRARY TO LAW, EXCESSIVE AND CRUEL AND UNUSUAL PUNISHMENT.

{¶ 81} Hawkins asserts that, insofar as he was 35 years old at the time of sentencing and "his first shot at parole is not until October 28, 2084, just shy of his 100th birthday," the sentence handed down by the trial court was "effectively a death sentence."

{¶ 82} We have observed:

A "trial court has full discretion to impose any sentence within the authorized statutory range, and [it] is not required to make any findings or

give its reasons for imposing maximum or more than minimum sentences." *State v. King*, 2013-Ohio-2021, 992 N.E.2d 491, ¶ 45 (2d Dist.), citing *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, paragraph seven of the syllabus. On review of a felony sentence, an appellate court may vacate or modify the sentence "only if it determines by clear and convincing evidence" that the record of the case does not warrant the sentence, pursuant to the relevant statutes, or that the sentence is otherwise contrary to law. *See State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.2d 1231, ¶ 1; *see also* R.C. 2953.08(G)(2). A sentence "is not contrary to law [if it falls] within the statutory range [and the trial court] expressly state[s] that it * * * considered the purposes and principles of sentencing [under] R.C. 2929.11 [and] 2929.12." (Citation omitted.) *State v. Rodeffer*, 2013-Ohio-5759, 5 N.E.3d 1069, ¶ 32 (2d Dist.).

*State v. Schwyter,* 2d Dist. Miami No. 2019-CA-20, 2021-Ohio-2021-83, ¶ 8.

{¶ 83} R.C. 2929.14(C)(4) governs consecutive sentences and provides:

(4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the

offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(b) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶ 84}** As the State points out, Count 1 required a mandatory sentence of 25 years to life, and the other 10 rape convictions were felonies of the first degree which carried a maximum sentence of 11 years. R.C. 2971.03(A)(1)(c); R.C. 2929.14(A)(1)(b). The State argues that, if the trial court had imposed maximum consecutive sentences across the board, Hawkins would have faced an aggregate prison sentence of 135 years to life. But the trial court did not impose maximum prison terms on each of the 10 rape convictions; instead, it imposed four years on each, only one year over the minimum sentence. The State also argues that the trial court properly imposed consecutive sentences because "the offenses were separated by time and location."

**{¶ 85}** Finally, "[w]here none of the individual sentences imposed on an offender are grossly disproportionate to their respective offenses, an aggregate prison term resulting from consecutive imposition of those sentences does not constitute cruel and

unusual punishment." *State v. Hairston*, 118 Ohio St.3d 289, 2008-Ohio-2338, 888 N.E.2d 1073, syllabus. "[F]or purposes of the Eighth Amendment and Section 9, Article I of the Ohio Constitution, proportionality review should focus on individual sentences rather than on the cumulative impact of multiple sentences imposed consecutively." *Id.* at ¶ 20. Hawkins's sentence on Count 1 was mandatory, and the court's imposition of four-year sentences on the remaining counts was not grossly disproportionate to his offenses.

{¶ 86} Based upon the foregoing, we conclude that the trial court did not err in sentencing Hawkins to 65 years to life. His fourth assignment of error is overruled.

{¶ 87} The judgment of the trial court is affirmed.

. . . . . . . . . . . .


HALL, J. and WELBAUM, J., concur.


Copies sent to:

Mathias H. Heck, Jr.
Elizabeth A. Ellis
Lucas W. Wilder
Hon. Gerald Parker